KELLOGG and others *against* ROCKWELL and others.

*N,* a manufacturing corporation, mortgaged its real estate, machinery, tools, and stock on hand, to *A* and *B,* to secure them for their liabilities for and claims against *N ;* and *A* and *B,* the next day took possession of the mortgaged property, except a lot of coal and a lot of wool. The coal had been purchased of *D,* on credit, for *N,* and left upon *D's* wharf, whence it was taken by *N,* in parcels, as it was wanted for use. After the execution of the mortgage, *A* and *B* demanded of *D,* the coal remaining on the wharf, which *D* refused to deliver, claiming a lien thereon for the price. The wool was bought of *E,* about a fortnight before the mortgage; was weighed; a bill of sale made out; and the notes of *N* taken for the amount; but it remained in *E's* store. When demanded by *A* and *B,* as mortgagees, *E* retained it under a claim of right, as security for his debt; and *A* and *B* never came into possession of either the coal or the wool. On a bill to redeem, by subsequent mortgagees, against *A* and *B,* it was held, that *A* and *B* were not chargeable with the value of such coal and wool.

A mortgagee in possession, by tenant or otherwise, is accountable for the rent, and bound to apply it to lessen his debt.

But where the mortgagees of the unfinished stock of a manufacturing establishment had possession of the premises, about fifty days, for the purpose of completing such unfinished stock, that it might be sold, and the wages of the workmen paid ; and this was done; it was held, that the rent for this period was sufficiently accounted for, in the enhanced value of the goods.

The mortgagors of a manufacturing establishment let the premises to *P,* a third person, under an agreement with him, to run the works for a certain period, pay the expenses, sell the manufactured goods, and apply the nett proceeds to the payment of the mortgage debts. This arrangement was fairly made, with the advice and consent of the mortgagees, as the best thing that could then be done. It continued about half the stipulated time, and resulted in great loss. *P* was unwilling to enter into such agreement, without a bond of indemnity to the amount of 15,000 dollars ; and thereupon two of the mortgagees and a friend gave their several bonds for 5,000 dollars each, to indemnify *P* to that amount. At the time of such arrangement, the mortgagees sold to *P* all the stock, finished goods and stock in process of manufacture, mortgaged to them, for a certain sum paid by *P,* which sum, except a small balance, they applied in payment *pro tanto* of the mortgage debts. It appeared from parol evidence, that the letting of the works to *P,* the giving of the bonds of indemnity and the sale of the personal property, were parts of the same transaction. On a bill to redeem, by subsequent mortgagees, against *A* and *B,* it was held, 1. that *A* and *B,* not having been in possession of the manufacturing works, were not accountable for the rent ; 2. that no relief could be had against the bonds of indemnity ; 3. that the parol evidence introduced, was properly received; 4. that there was nothing exceptionable in the entire arrangement made with *P* ; 5. that said balance, with interest, must be applied upon the mortgage debt of the defendants.

*C* being under private liabilities to the defendants, to the amount of 40,000 dollars, and *N,* a manufacturing company, being under liablilities to them, to the amount of 49,200 dollars, *C* mortgaged to them his dwelling-house, of the value of 24,000 dollars, to secure them against all these liabilities ; *N,* at the

same time, mortgaging its property, to indemnify them for their liabilities on its account. After applying the property included in both mortgages, the liabilities of the defendants of neither description, would be extinguished. Held, that subsquent mortgagees had no right to claim the application of a proportionable part of the 24,000 dollars, to sink the company debts, but the defendants were at liberty to apply the whole of that sum, as well as the remaining private property of *C*, included in his mortgage, to the private debts of *C*.

*Hartford*,
June, 1849.

Kellogg
*v.*
Rockwell.

THIS was a bill in chancery for an account of the proceeds of mortgaged property, for the application thereof to the claims of the plaintiffs respectively, for liberty to redeem, and for other relief.

On the 12th of *November* 1846, *Charles W. Rockwell* mortgaged his dwelling-house and the land on which it stands, to *Henry Hall* and *John A. Rockwell*, to secure the sum of 8,200 dollars, made up of 4,000 dollars in liabilities purporting to be the proper debts of the mortgagor, and 4,200 dollars, purporting to be the proper debts of the *Norwich Woolen Company*, and a part of the sum of 49,200 dollars, about to be mentioned. On the same day, *C. W. Rockwell* mortgaged the same house and land, and two other pieces of land, to the same persons, to secure them for their liabilities upon paper, amounting to the sum of 89,200 dollars, of which 40,000 dollars, including 4,000 dollars secured by the mortgage first mentioned, purported to be the individual paper of *C. W. Rockwell*, and 49,200 dollars, including 4,200 dollars embraced in the first-mentioned mortgage, purported to be the paper of the *Norwich Woolen Company*. On the same day, the *Norwich Woolen Company* mortgaged their real estate and machinery to *Henry Hall*, to secure him against his liability on his acceptance of eight drafts, amouting to 14,200 dollars, which it was the duty of the mortgagors to pay. This company, on the same day, mortgaged the same property to *John A. Rockwell*, to secure him for his liability as indorser of sixteen notes, amounting to 36,000 dollars, drawn by the *Norwich Woolen Company*; as indorser also of eight notes, amounting to 11,000 dollars, made by *C. W. Rockwell*, for the benefit of the *Norwich Woolen Company*; as indorser also of fifteen drafts, amounting to 28,000 dollars, by *C. W. Rockwell*, on Messrs. *Shipman & Ayers*, for the benefit of the *Norwich Woolen Company;* all of which notes and drafts it was

their duty to pay.  On the same day, the *Norwich Woolen Company* mortgaged all their stock and tools in their mill, estimated to be of the value of 55,463 dollars, 34 cents, (an inventory of which is set out in the bill,) to *John A. Rockwell,* to secure him against his bond for the sum of 5,400 dollars, conditioned to pay certain sums of money, due from the company to divers individuals, operatives in and about the mill, for services therein rendered.  On the same day, the *Norwich Woolen Company* mortgaged the same property again to *Henry Hall* and *John A. Rockwell,* to secure them for the liabilities heretofore mentioned, amounting to the sum of 89,200 dollars.

After these transactions, the *Norwich Woolen Company,* on the same 12th of *November,* 1846, mortgaged to the plaintiffs the real and personal estate described in their first-mentioned mortgage deed to *Henry Hall,* subject to the incumbrances therein mentioned, and also subject to the incumbrances mentioned in their deed to *John A. Rockwell,* to secure sundry debts due from the *Norwich Woolen Company* to the plaintiffs respectively.  The condition of this deed contained a provision for the substitution of other notes of the company for the existing notes and debts of the plaintiffs ; and the deed was conditioned for the payment of such substituted securities.  Such of the plaintiffs as are named in said mortgage, except the *Quinebaug Bank,* accepted the substituted notes, within the time limited for that purpose.

On the 13th of *November,* 1846, *H. Hall* and *J. A. Rockwell* took possession of all the property, real and personal, mortgaged to them, by the *Norwich Woolen Company,* except a lot of coal, the estimated value of which was 1026 dollars, and a lot of wool, valued at 2730 dollars.

The coal was part of a cargo of coal, purchased for the *Norwich Woolen Company* of *Edward Chappell,* upon credit, by *C. W. Rockwell,* for which his own notes were given, and a part of them were, on the 12th of *November,* 1846, outstanding, the time of payment not having elapsed. On the arrival of the coal at *Norwich,* it was placed upon *Chappell's* wharf, from which it was taken, by the *Norwich Woolen Company,* in parcels, from time to time, as they had occasion for it, without any application to *Chappell,* or any objection on his part.  The debt due from *C. W. Rockwell* to

*Chappell*, and included in said mortgage, was made up in part of the sum due for this coal. A demand being made upon *Chappell*, for the coal, on the 13th of *November*, 1846, by *H. Hall* and *J. A. Rockwell*, he refused to deliver it to them, claiming a right to retain it as a security for his debt. They did not consent to any detention by him, but have never instituted any process to recover it, and *Chappell* has since become insolvent.

The wool in question was a lot of wool bought on the 26th of *October*, 1846, of *J. W. Huntington & Co.*, as cash. It was duly weighed, and a bill thereof made out, and the notes of the *Norwich Woolen Company*, dated *Nov.* 5th, 1846, were given to *J. W. Huntington & Co.*, in payment thereof. The wool remained in the store of *J. W. Huntington & Co.* after the failure of the *Norwich Woolen Company*, and was demanded by *Hall* and *J. A. Rockwell;* but *J. W. Huntington & Co.* retained it, under a claim of right, as security for the notes they held; and it never came into the possession of *Hall* and *J. A. Rockwell;* nor have they ever commenced legal process to recover it.

From the personal property mortgaged to *Hall* and *J. A. Rockwell* they made sales thereof to certain persons, from the proceeds of which sales they paid and satisfied several of the debts described in and secured by said mortgages; and the residue of said proceeds has been applied in payment of interest on other mortgage debts, being a part of the 49,200 dollars, held by divers banks, and in payment of additions to and repairs made upon the mill property.

On the 4th of *January* 1847, the *Norwich Woolen Company* made a contract with *Almy, Patterson & Co.* for the operation of the mill of the company, for the period of three years; by which *Almy, Patterson & Co.* agreed, to furnish materials necessary for the regular and successful operation of the mill; to pay monthly for the labour and other incidental expenses of operating the mill; to sell the manufactured goods, and to apply the net proceeds to the payment of certain debts of the company, secured by mortgages of their property. *Almy, Patterson & Co.*, however, were unwilling to enter into this agreement, without a bond of indemnity, to the amount of 15,000 dollars; whereupon *H. Hall, J. A. Rockwell* and *George Hall*, executed their seve-

ral bonds for the sum of 5,000 dollars each, for that purpose. This agreement was made by the *Norwich Woolen Company*, with the advice and consent of *H. Hall* and *J. A. Rockwell*, for the objects therein expressed, in good faith, and with an expectation by the parties thereto, that it would result for the benefit of all the creditors of such company.

The mill was operated, by *Almy, Patterson & Co.*, from the 4th of *January* 1847, to the 28th of *September* 1848; and the result of their operations was, that during that time, the mill sustained a loss of about 20,000 dollars.

On the same 4th of *January* 1847, *H. Hall* and *J. A. Rockwell* sold to *Almy, Patterson & Co.* all the stock, finished goods and stock in the process of manufacture, mortgaged to them, then remaining on hand, and gave a bill of sale thereof, for the sum of 42,055 dollars, 42 cents; which sum was paid, by *Almy, Patterson & Co.*, to said *Hall* and *Rockwell;* who thereupon applied the sum of 5,460 dollars, 17 cents, for the benefit of the mortgaged property; the sum of 34,440 dollars, in part payment of said company notes and drafts, amounting to the sum of 49,200 dollars, being seventy *per cent.* of that amount; and retained in their hands a balance of 2,155 dollars, 25 cents.

It appeared from parol evidence, if admissible for that purpose, (which was objected to, by the plaintiffs,) that the contract with *Almy, Patterson & Co.*, for running the mill, the bonds of *H. Hall, J. A. Rockwell* and *George Hall*, and the sale of said personal property, on the same day, to *Almy, Patterson & Co.*, were one and the same transaction, neither part of which would have been entered into, without the other.

The plaintiffs never requested *H. Hall* and *J. A. Rockwell* to give them a lease or possession of the mill. The rent of it is worth 5,400 *per annum*. It is now in good order, and in better condition than it would have been in, had it stood still.

The dwelling-house of *C. W. Rockwell*, described in the two first mentioned mortgages, was, on the 16th of *February* 1849, sold, for the sum of 24,000 dollars; the two pieces of land not connected with the dwelling-house, mentioned in said mortgages, remain unsold, and are of the value of

2,500 dollars; and the private property of *C. W. Rockwell*, mortgaged as aforesaid, is worth less than the sum of 30,000 dollars.

The notes and drafts before mentioned, amounting to the sum of 49,200 dollars, were made by *C. W. Rockwell*, as treasurer of the *Norwich Woolen Company*, and indorsed by *H. Hall* and *J. A. Rockwell*, in good faith, without any other knowledge of the manner in which they were being used by *C. W. Rockwell*, than what may be legally inferred from their being stock-holders and directors of the company. The residence of *Hall* was in *Boston, Mass.*, and *J. A. Rockwell* was most of the time a resident of the city of *Washington*. Each of them was occasionally at the mill, but trusted the management of the concern entirely to *C. W. Rockwell*.

The *Norwich Woolen Company* was formed under the law of this state relating to joint-stock corporations. The only stock-holders of the concern were *C. W. Rockwell, H. Hall* and *J. A. Rockwell*. The capital stock of the company was 100,000 dollars, of which *C. W. Rockwell* owned 98,000 dollars, and *H. Hall* and *J. A. Rockwell*, 1,000 dollars, each. *C. W. Rockwell* was president and treasurer of the company. The company commenced operations on the 1st of *January* 1846; and their books were always open to the inspection of the stock-holders and directors.

*H. Hall* has taken up and satisfied the drafts upon him, amounting to the sum of 13,200 dollars; and has received, from the proceeds of sales made by him and *J. A. Rockwell*, seventy *per cent.* of the amount of that sum, and the interest thereon to the 31st of *December* 1847. The balance of said drafts, with interest, is now due to *H. Hall*, unless it may be reduced, by the application of a portion of the proceeds of the sale of the private property of *C. W. Rockwell*, or by the application of other sums with which he may be charged, by reason of the facts herein stated.

*J. A. Rockwell* has not paid any portion of the notes, by him indorsed, amounting to 36,000 dollars; but the interest has been paid on those notes, to the 4th of *May* 1848, and seventy *per cent.* of the principal, from the proceeds of sales made by *H. Hall* and *J. A. Rockwell*, leaving due on said notes the sum of 10,800 dollars, and the interest thereon from the 4th of *May* 1848, unless this amount may be reduced, by

the application of a portion of the proceeds of the sale of the private property of *C. W. Rockwell,* or by the application of other sums with which *J. A. Rockwell,* or the holders of said notes, may be justly charged, by reason of the facts herein stated. If the sum of 49,200 dollars, or any portion thereof, secured upon the private property of *C. W. Rockwell,* is to be paid from the proceeds of the sale of said property, then the amount so paid is to be deducted from the sums due upon said drafts and notes.

*H. Hall* and *J. A. Rockwell* had actual knowledge of the mortgage to the plaintiffs, on or before the 24th day of *December* 1846, on which day a writ of injunction was served upon them, to enjoin them from applying any of the property of the *Norwich Woolen Company* in payment of the individual debt of *J. A. Rockwell.* They had also such knowledge as may be inferred from the record of the mortgage deed to the plaintiffs, made on the 13th of *November* 1846. The writ of injunction was pending, when this suit was commenced.

*C. W. Rockwell, H. Hall* and *J. A. Rockwell,* and the *Norwich Woolen Company* are the only parties defendants, who appear to defend, or make any claim, in respect to this bill, or the matters therein contained.

The case, embracing these facts, was reserved for the advice of this court, as to what decree ought to be passed, or decision made.

*Hungerford* and *Cone,* for the plaintiffs, contended, 1. That the mortgagees, *H. Hall* and *J. A. Rockwell,* were liable for the coal purchased of *Chappell,* and the wool purchased of *J. W. Huntington & Co.* This property belonged to the *Norwich Woolen Company,* at the time of the mortgage, and passed to the mortgagees, who had, or might have had, the benefit of it. The coal was *delivered,* and placed upon *Chappell's* wharf, for the use of the company. They alone had the controul of it; and they took it from the wharf, as they wanted it, without any application to *Chappell* for it. He had nothing further to do with it. The facts regarding the wool were essentially the same. It was sold; it was weighed; a bill of it was made out; and the notes of the *Norwich Woolen Company* were taken in payment. It was left in the store of *J. W. Huntington & Co.,* as the coal

was on *Chappell's* wharf, for the accomodation of the vendees. At any rate, *H. Hall* and *J. A. Rockwell*, as mortgagees, might have taken possession, both of the coal and the wool, and are chargeable with the value thereof. The vendors had no lien on either.

2. That the same mortgagees were liable for the rent of the mill, at a reasonable rate, while they were personally in possession, and at the rate of 5,400 dollars *per annum*, after the occupation of *Almy, Patterson & Co.* commenced. *Bentham* v. *Haincourt*, *Prec. Chan*. 30. 2 *Sw. Dig*. 193. *Gibson* v. *Crehore*, 5 *Pick*. 146. *Thayer* v. *Richards*, 19 *Pick*. 398. *Coppring* v. *Cooke*, 1 *Vern*. 270.

3. That they were chargeable with the sum of 5,460 dollars, 17 cents, received of *Almy, Patterson & Co.*, and applied, as they claimed, to the benefit of the mortgaged property. *Quin* v. *Brittain*, 1 *Hoff*. 353. *Saunders* v. *Frost*, 5 *Pick*. 259. *Moore* v. *Cable*, 1 *Johns. Ch. R*. 385.

4. That they were also chargeable with the amount of the stock and goods, finished and unfinished, which went into the hands of *Almy, Patterson & Co.*, being sold to them. In the first place, the defendants had no authority to jeopard the property, by making it liable to the hazards of continuing the business according to the agreement with *Almy, Patterson & Co.* Secondly, they have received the value of the property, and it has been wrought up and gone ; and they are chargeable with the value. Thirdly, parol evidence was not admissible to connect the bill of sale with the contract for running the mill, and to show that both are to be taken as one and the same instrument. Fourthly, if connected with the agreement with *Almy, Patterson & Co.*, the construction would not be, in any respect, varied, as a *sale* of the property is compatible with the terms of that agreement. Fifthly, there is no reason why these plaintiffs should be, either directly or indirectly, subjected to the loss of continuing the operations of the establishment. By the mortgage, the only power given, was, to sell the property mortgaged, and to prepare it for that purpose, by completing the manufacture of it. It is not found, nor is there evidence to show, that any loss was sustained, in working up and completing the manufacture of the stock mortgaged. But whether *Almy, Patterson & Co.* would, or would not, have purchased

the stock but for the contract of running the mill, or the bonds given to indemnify them against loss, does not vary the liabilities of *Hall* and *J. A. Rockwell* to these creditors.

5. That the mortgagees, *Hall* and *Rockwell*, were chargeable, as having been paid to them on the first mortgage on the private property of *C. W. Rockwell*, out of the proceeds of his homestead, with 4,000 dollars upon his private indebtedness, and 4,200 dollars upon the company paper, leaving unpaid of the company paper, 45,000 dollars, and of the private paper, 36,000 dollars ; also leaving unappropriated, of the 24,000 dollars, to be applied on the company and private paper, in the proportion of 45,000 to 36,000, the sum of 14,000 dollars. It is to be remarked, in the first place, the mortgage for 8,200 dollars is the first mortgage on the private property, and the first to be paid. Secondly, by an arrangement between the parties to the deed, the paper standing in the name of the company and the private paper of *C. W. Rockwell* were all placed on the same footing. Thirdly, it was the duty of *C. W. Rockwell* to pay the paper standing in the name of the company, as well as that standing in his own name, the whole being his own paper in effect.

6. That the paper standing in the name of the company, having been used for the benefit and accomodation of *C. W. Rockwell*, the defendants, *Hall* and *J. A. Rockwell*, are chargeable with *notice* of that fact. First, because all the accounts of the company with *C. W. Rockwell* were kept upon the company books, and were subject to their inspection. Secondly, they being indorsers of the paper from time to time, knew of its existence, and were bound to ascertain whether it was for the benefit of the company, or of *C. W. Rockwell*. Thirdly, having confided the management of the business entirely to *C. W. Rockwell*, and paid no attention to the affairs of the company, they were guilty of culpable and gross negligence, as directors of the company, which is equivalent to express notice. *Robinson* v. *Smith*, 3 *Paige* 222. *Verplanck* v. *Mercantile Ins. Co.* 1 *Edw. R.* 84. *Scott* v. *Depeyster, Id.* 513. *Austin* v. *Daniels*, 4 *Denio* 299. *Rev. Stat.* 184. *Sagory* v. *Dubois*, 3 *Sand. Ch. R.* 499.

7. That to apply the property of the company to the payment of the notes and drafts, which it is the duty of *C. W.*

*Rockwell* to pay, is to divert the funds of the company from their legitimate use.  *Nathan* v. *Whitlock*, 9 *Paige* 159. *Allen* v. *Coit & al.* 6 *Hill* 318, 321, 2.

*T. C. Perkins* and *J. A. Rockwell,* for the defendants, after remarking, that there was no charge of fraud upon any of the defendants, and that it appears from the finding that they have done just what, at the time, they deemed most for the benefit of all concerned, contended, 1. That the plaintiffs, in coming to redeem, ought not to be relieved from paying the prior incumbrances, because *H. Hall* and *J. A. Rockwell* have other security on the private property of *C. W. Rockwell.* This was also heavily mortgaged for his private debts. Equity will apply each description of property, to its appropriate liabilities. Nor will it interpose in favour of subsequent mortgagees, in such a way as to do injustice to those whose legal rights are superior, and whose equity is at least equal.  *Osborn* v. *Carr* & al. 12 *Conn. R.* 195.  *Kendall* v. *New-England Carpet Co.,* 13 *Conn. R.* 395, 6.  *Butler* v. *Elliott,* 15 *Conn. R.* 187. 204.  In any event, the prior mortgagees are, in the first place, to be protected ; and the application of the different classes of securities, is to be settled, by the actual holders of the paper, and the subsequent mortgagees.

2. That the plaintiffs ought not to be relieved, to the prejudice of the defendants, *Hall* and *J. A. Rockwell,* by reason of the arrangement with *Almy, Patterson & Co.* and the sale of the stock in the mill to them. In the first place, the plaintiffs have no direct lien on this property : only such as a court of equity will give.  *Butler* v. *Elliot,* 15 *Conn. R.* 187. *Kendall* v. *New England Carpet Co.* 13 *Conn. R.* 383. *Thrall* v. *Spencer,* 16 *Conn. R.* 139. Secondly, the defendants, *Hall* and *J. A. Rockwell,* were *authorized* to do what they did. They could have sold out unconditionally, and paid themselves ; and if so, they could make any other *bona fide* contract respecting the property. Thirdly, they acted in good faith and for the benefit of all. Fourthly, this was a *judicious* course, at the time. The mortgagees could not personally carry on the business. The property was not saleable. All expected profit, and no one objected. Fifthly, can these plaintiffs now object ? They have no conveyance

of this property. Their direct security is untouched. The first mortgagees owe no other duties to them, than to *unsecured* creditors; for such creditors could compel a proper application of the fund. Sixthly, the whole transaction with *Almy, Patterson & Co.* was in substance *one;* and all the writings are to be construed together as one instrument. *Isham* v. *Morgan*, 9 *Conn. R.* 374. *Perry* v. *Holden*, 22 *Pick.* 269, 276. Seventhly, parol evidence was admissible. *Baldwin* v. *Carter*, 17 *Conn. R.* 201. *Brown* v. *Slater.* 16 *Conn. R.* 192. *Wooster* v. *Butler*, 13 *Conn. R.* 309, 318. 13 *Peters*, 89.

3. That the bonds given by *H. Hall, J. A. Rockwell* and *G. Hall,* for 5000 dollars, each, should be allowed against the plaintiffs. These bonds were executed at the time of the sale, in good faith, to aid the other parties. They constituted substantially a condition of the sale. They amounted to a contract to refund this proportion of the nominal purchase money.

4. That the 49,200 dollars of paper, was in reality, as it purported to be, the debt of the *Norwich Woolen Company.* In the first place, the avails of this paper were actually paid out for the use of the company. Secondly, the keeping of the funds indiscriminately, will not affect the company's liability on their own paper. This becomes a mere question of book-keeping. Thirdly, even if as between *C. W. Rockwell* and the company, the 49,200 dollars, is his debt to pay, these mortgagees are not affected by it. They are *bona fide* accommodation indorsers: they only know what appears on the face of the paper. Even if there were fraud on the part of the agent, these indorsers would not be affected. Far less would they be affected, by the mere manner in which he kept his books; or by the fact, that upon his final settlement with the company, he was indebted to them. Fourthly, these mortgagees are not affected with constructive notice, from the mere fact of their being stockholders and directors. There is no provision in the statute working that effect. They resided at a distance; and had every reason to confide in their agent. In addition to this, the company subsequently recognized their liability, and gave security. But fifthly, if the mortgagees may be affected with constructive notice, nothing appears in the case, notice of which would subject them. Sixthly, in any event, there

was no other misapplication of the fund received from the paper composing the 49,200 dollars, than of all the other funds of the company received by *C. W. Rockwell ;* and if the mortgagees are to be subjected to any loss, it should be only in the proportion the 49,200 dollars bears to the whole sum so received by *C. W. Rockwell.*

5. That the mortgagees are not to be affected, by the detention of the coal by *Chappell,* or of the wool by *J. W. Huntington & Co.*

6. That no costs, in any event, are to be allowed against the defendants ; as no demand for an account, was ever made of them, and no offer to redeem, was made to them. *Saunders* v. *Frost,* 5 *Pick.* 259. 271. & seq.

ELLSWORTH, J. This case, though extending over a great surface, and involving many and complex transactions, in truth involves only common and well settled principles. The amount of property is large, and it is divisible into parts, each of which is subject to its peculiar considerations ; but to none of them have the plaintiffs a *title,* except the land and factory of the *Norwich Woolen Company.* This they seek to redeem. They insist, that the defendants, *J. A. Rockwell* and *H. Hall,* who are prior mortgagees, have other property which they received from *Charles W. Rockwell* and the *Norwich Woolen Co.,* and which they ought to apply to reduce their debts, and leave the security held by the plaintiffs so much the more relieved.

The first claim, is, that the defendants shall be charged with 2730 dollars, the value of a lot of wool, contained in one of their mortgages. The defendants admit the fact, but say, they have not received the wool ; that the *Norwich Woolen Co.* had not paid *Huntington & Co.,* the vendors, who, still having the possession, set up a *lien* for the price, and refused to give up the wool, when demanded, by the defendants. The defendants have never refused the use of their names to obtain possession, but have declined embarking in litigation themselves, in order to try the question of title. We doubt if they had the title, except subject to the lien for the price, and which they were not bound to remove. At all events, in accounting, they could not, under the circumstances, be held liable for this wool to *Charles W. Rockwell,*

or the *Norwich Woolen Co. ;* nor can they be liable to those who represent them.

The same is true of the lot of coal, worth 1026 dollars, bought of *E. Chappell,* though the title to this is less doubtful. In relation to both the coal and the wool, we see nothing in the conduct or inactivity of the defendants, as mortgagees, which should make them liable for this property, which they have not received.

It is next claimed, that the defendants are liable for the rent of the *mill,* at the rate of 5400 dollars a year, (its ascertained value,) from the time they took possession until it was given up, by *Almy, Patterson & Co.,* a period of some twenty months. There is no doubt a mortgagee in possession, by tenant or otherwise, is accountable, and bound to apply the rent to lessen his debt. Here, the defendants were themselves only some fifty days in possession, just to complete the unfinished work, that it might be sold, and the workmen paid; to whom *J. A. Rockwell,* one of the defendants, was security for their wages, in a bond of 5400 dollars, agreeably to the stipulations in the mortgage deed. Rent for these fifty days, we think, is sufficiently accounted for, in the enhanced value of the goods, which were sold, and the avails duly applied towards the debt of the *Norwich Woolen Company.*

At the expiration of the fifty days, the defendants gave up possession, and the mortgagors let the mill, and gave possession to *Almy, Patterson & Co.,* who run it about eighteen months, under a contract for a longer period, entered into with the mortgagors, as we think, fairly and properly enough, as the best thing that could be done at the time. The mill was run at a great loss. That loss must be borne, by the persons engaged in that *experiment ;* and we cannot relieve them against the bonds of 15,000 dollars, given to *Almy, Patterson & Co. ;* but there is no reason for holding the defendants, (not in possession,) accountable for rent.

As to the sale of 42,000 dollars of personal property, by the defendants, to *Almy, Patterson & Co.,* and the application of the money, by the defendants, on their liabilities for the *Norwich Woolen Company,* we see no objection whatever. There is no evidence, that more could have been realized, in any other way. The liabilities of the defendants for the company, were immense. It was a duty they owed

themselves, and all others concerned in these securities, to convert this large mass of property into cash, at an early day, and pay the debts, as fast as they fell due.   We see nothing censurable or exceptionable in the entire arrangement made with *Almy, Patterson & Co.*   At the best, the defendants will be losers, besides their 5000 dollars, each, which, of course, is no incumbrance upon the property mortgaged, since it was an enterprise of their own, at their own risk.   Nor is there any technical rule of evidence, as was contended, on the argument, that renders it improper for us to view the sale to *Almy, Patterson & Co.*, as is claimed by the defendants.

It is again claimed, that *Charles W. Rockwell*, being president of the *Norwich Woolen Co.*, (a joint stock corporation, under the statute,) failed to conduct the business of the company conformably to the provisions of the law ; in which default, it is said, the defendants are implicated ; and therefore, the company becomes an ordinary partnership ; and its members must be postponed to all its creditors.   This might be the consequence, if there were facts to sustain the claim ; but there are none.

Again, it is said, that a rateable proportion of the 24,000 dollars, received for the dwelling-house of *C. W. Rockwell*, should be applied to sink the company debts, and not exclusively, as has been done, the private debts of *C. W. Rockwell*. *C. W. Rockwell*, being under private liabilities to the defendants, to the amount of 40,000 dollars, and the *Norwich Woolen Company*, to the amount of 49,200 dollars, making 89,200 dollars, he mortgaged to them his dwelling-house, to indemnify against all these liabilities ; and the *Norwich Woolen Company* mortgaged, to indemnify against the company liabilities.   Neither the company, nor private liabilities are extinguished, after all, or nearly all, the property has been applied ; nor will the defendants be kept harmless, after the small remainder shall be applied ; and why, then, are they to be postponed, or to come in upon an equality with *subsequent* mortgagees ?   The remaining private property of *C. W. Rockwell*, the land unsold, being of the value of 2500 dollars, when sold, may be, if it must not be, applied on the private debts of said *Rockwell*, for which the defendants are liable.   And as to the 2155 dollars, in their hands, received

on the 16th day of *February*, 1847, for the personal property of the *Norwich Woolen Company*, sold to *Almy, Patterson & Co.*, the defendants must apply that amount, with interest, upon the debt due the defendants from the company; and beyond that, we do not hold them accountable to the plaintiffs, except what has been done.

In this opinion the other Judges concurred.

Decree accordingly.