## LAFAYETTE Co. and others *v.* NEELY and others.

*(Circuit Court, W. D. Tennessee.  October 6, 1884.)*

1. EQUITY PRACTICE—CORPORATIONS—NINETY-FOURTH EQUITY RULE—TENNESSEE CODE, §§ 1492-1497.

    Where a Tennessee corporation has been dissolved by a foreclosure sale of its franchises, but its existence is continued by statutory provision for a term of five years, during which suit may be brought in its name to wind up its affairs, a bill by stockholders is well filed under the ninety-fourth equity rule, if it appear that the suit is not a collusive one, and that the plaintiffs have applied to such of the late directors as they can reach to bring the suit, and they have refused.

2. SAME SUBJECT—STATUTORY RECEIVER UNDER TENNESSEE ACT, 1852, *c.* 151— TENNESSEE CODE, § 1101.

    But where the corporation was a railroad company, indebted to the state for aid under the internal improvement acts of 1852, and was, at the time of the dissolution, in the hands of a receiver appointed by the governor, the receiver was, under those acts, by operation of law, the manager of the company, and the proper person to bring suits in the name of the dissolved corporation, as required by the Tennessee Code; and if the suit be against the receiver himself to call him to account, the ninety-fourth equity rule would not apply, as it would be unreasonable to ask him to sue himself.  The stockholders, therefore, may proceed in their individual right without compliance with the ninety-fourth rule in that respect.

3. EQUITY—TRUSTS—RIGHT OF BENEFICIARY TO AN ACCOUNT—ACCOUNTING WITH EXECUTIVE DEPARTMENT.

    It is quite a matter of course that a trustee shall, in a court of equity, pass his accounts whenever demanded by the beneficiary; and he cannot escape an account by showing that the judgment creditors of the beneficiary will absorb the fund, or that he is a statutory receiver, authorized to report to the governor of the state, to whom he has made a satisfactory report.  An act of the legislature conferring exclusive power over such account on the executive department would probably be unconstitutional.

4. SAME SUBJECT—UNSATISFACTORY ACCOUNT.

    But where it appears that the beneficiary has not been injured by the too general statement of the account, and a failure to file vouchers in the executive department, and there is no showing of false or fraudulent conduct, a court of equity will not, for the mere satisfaction of the plaintiff, require the receiver to account more in detail, and file his vouchers, when the plaintiffs have been foreclosed of their interest in the fund by a mortgage sale.

5. EQUITY PLEADINGS—GENERAL ACCUSATION OF FRAUD.

    Mere epithetic accusations of fraud will not suffice in equity pleading, but the facts must be stated which show the conduct complained of to be fraudulent.

6. MORTGAGOR AND MORTGAGEE — ACCOUNT FOR RENTS AND PROFITS — FORECLOSURE SALE—RIGHT OF PURCHASER—SENIOR AND JUNIOR MORTGAGES.

    Where a prior mortgagee is in possession, and pending his possession there is a foreclosure sale under a subsequent mortgage, a person buying the property subject to the prior lien, in the absence of any agreement or other circumstance fixing the amount of the incumbrance, is entitled to an account with the senior mortgagor to ascertain the amount due to him at the time of the sale from the mortgagee, and his bid, presumably, included only the amount found due on that accounting.

7. SAME SUBJECT—CREDITS ALLOWED—PERMANENT IMPROVEMENTS.

    On such accounting the senior mortgagee will be allowed credits for all permanent improvements and necessary expenditures during his possession, and all incumbrances paid before the sale.

8. SAME SUBJECT — RAILROADS — TENNESSEE INTERNAL IMPROVEMENT ACTS OF 1852—TENNESSEE CODE, § 1101—STATE RECEIVER.

    This principle applies to a receiver in possession of a railroad under the Tennessee internal improvement acts of 1852, (Code, § 1101,) during whose

possession the road is sold at the suit of its own mortgage bondholders, and the equity of the purchasers to the accumulated earnings in his hands is paramount to that of the stockholders and creditors, and the bill of the latter for an account will be dismissed.

9. SAME SUBJECT—TENNESSEE RAILROAD LIQUIDATION ACT OF 1869, *c.* 38.

This principle of the general law of the relation of the parties is strengthened by the liquidation act of 1869, *c.* 38, under which the purchasers, by consent of plaintiffs, liquidated the company's debt to the state on the express condition that the purchasers should be substituted to the lien of the state upon the earnings in the receiver's hands. The plaintiffs cannot now repudiate that agreement by diverting the fund to the payment of other debts, or by distribution of it among the stockholders.

In Equity.

*Harry M. Hill* and *Humes & Poston,* for plaintiffs.

*E. C. Walthall, Wright & Folkes,* and *James Fentress,* for defendants.

HAMMOND, J.    The objection that this bill does not show conformity to the ninety-fourth equity rule cannot, I think, be maintained. The bill was filed April 1, 1882, and if we date the alleged dissolution of the corporation at the time of the foreclosure sale on August 27, 1877, which is the very earliest date at which it can be said to have been dissolved, the suit was commenced within the five years allowed by our statutes for a dissolved corporation to bring suits in its corporate name, notwithstanding the dissolution. Tenn. Code, 1492–1497; *Rogersville & Jefferson R. R.* v. *Kyle,* 9 Lea, 691; *Kelley* v. *Mississippi Cent. R. Co.* 2 Flippin, 581; S. C. 10 Cent. Law J. 286; S. C. 1 FED. REP. 564. But if a later date be fixed, such as the confirmation of the sale or the final decree in the foreclosure suit, which would bring the date of the suit beyond the five years of the statute, it is clear the ninety-fourth equity rule does not apply, if it be conceded that it applies during the five years to a dissolved corporation with continuing power to sue under the peculiar features of the above-cited Tennessee statutes, as to which I express no opinion. The rule does not, in terms, include a dissolved corporation, (Jones, Rules, 151,) and it seems settled that the dissolution of a corporation, and its inability to proceed by suit, does not deprive the shareholders of a remedy in their own name in a court of equity. *Rogersville, etc., R. R.* v. *Kyle, supra,* at p. 698; *Shields* v. *Ohio,* 95 U. S. 319, 324; *Bacon* v. *Robertson,* 18 How. 480; *Lum* v. *Robertson,* 6 Wall. 277. Of course, when the functions of the directors, managers, and shareholders have closed by dissolution, they no longer occupy that relation, and it is in their own right as individuals that the shareholders must seek redress. It cannot be, therefore, that in such a case the ninety-fourth rule was intended to operate. *Greenwood* v. *Freight Co.* 105 U. S. 13, 16. Conceding, however, that the rule extends to a Tennessee corporation during the five years of posthumous existence granted to it by the state statutes, the amendment shows that the plaintiffs have done everything that they could reasonably be required to do, under the existing circumstances, to comply with the rule. Affidavit is made that

plaintiffs were shareholders at the time of the transaction, and that the suit is not a collusive one to confer on a court of the United States jurisdiction of a case of which otherwise it would have no cognizance, which manifestly, without the affidavit, it is not; and, after all, this is the main requirement of the rule, if not its chief object, and the only one in the power of the court to accomplish by a rule of practice; for, it cannot be assumed that the court intended to or could, under a power to prescribe rules of practice, impose limitations on the jurisdiction on the federal courts not imposed by any act of congress. The rule should not, at least, be so construed until the supreme court itself has affirmed the power to do this. The cases upon which the rule is predicated explain its meaning, and they do not require impossibilities on the part of a shareholder. In the leading case of *Hawes* v. *Oakland,* 104 U. S. 450, 461, where the required efforts to secure corporate action are described, it is said that the plaintiff may ".show a case, if this be not done, where it could not be done, or it was not reasonable to require it;" and the "total destruction of the corporate existence and the annihilation of all corporate powers" constitute an acknowledged exception to the rule. *Greenwood* v. *Freight Co., supra.* See, also, *Detroit* v. *Dean,* 106 U. S. 537; S. C. 1 Sup. Ct. Rep. 560; *Hayden* v. *Manning,* Id. 586; S. C. 1 Sup. Ct. Rep. 617; and *Dimpfel* v. *Ohio & M. Ry. Co.* 110 U. S. 209, S. C. 3 Sup. Ct. Rep. 573, for a further elucidation of the principles upon which the rule is founded.

Now, by the Tennessee Code, "the managers of the business of such corporation at the time of its dissolution, by whatever name known, are the trustees of the stockholders and creditors," authorized by these statutes to settle its affairs and "sue for and recover the debts and property of such dissolved corporation in its corporate name." Tenn. Code, §§ 1494, 1495.

The principal defendant, Neely, was himself, at the time of the dissolution of this corporation, the statutory receiver appointed by the governor under the act of February 11, 1852, c. 151, § 5, p. 207, (Code, § 1101,) "to take possession and control of said railroad and all the assets thereof, and manage the same, etc., and to continue in possession of said road, fixtures, and equipments, and run the same, and manage the entire road" until the debt to the state was paid. *State* v. *E. & K. R. R.* 6 Lea, 353, 355; *Erwin* v. *Davenport,* 9 Heisk. 44. If this was not the "annihilation of all corporate powers," it certainly did, in fact, as appears by this bill, paralyze those corporate powers; for the road was surrendered by him to the purchasers under the foreclosure sale, he accounted only to the governor or these purchasers, and the directors or stockholders have not since attempted any corporate action or kept up any corporate organization. Either Neely was himself the person to whom, under this rule and these state statutes, application should have been made to bring this suit in the corporate name,—which were a vain thing to

do, and it is unreasonable to ask it,—or no such application could, under the terms of the statute, be made at all. The directors and stockholders were, by the statutes, superseded or deprived of their power, and under the law it has never been restored to them. *Erwin* v. *Davenport, supra.* Furthermore, the amended bill alleges that the plaintiffs have applied to such of the directors as they could find to take corporate action in this matter; but that they are scattered throughout the country, and have apparently abandoned all their functions and refused to act. Having made all stockholders who choose to come in parties, it would seem, under the circumstances, unreasonable to require that corporate action should be sought through application to them. The bill does not with sufficient precision name the directors to whom application was made, nor show in detail the efforts to comply with the rule in that regard, as it should have done; but, under the facts disclosed, I am of opinion that the plaintiffs have done the best they could, and for the reasons stated overrule that ground of demurrer.

•The plaintiffs insist that at all events the corporation was, and now they are, entitled to an account against their trustee, this statutory receiver of their property. Certainly I have been unable to find any case where the trustee can refuse to account because the beneficiary would get nothing if an account were had, by reason of his inability to respond, which is not set up here, however, or any other reason, such as that there are judgments against the beneficiary which would absorb the products of the account, as has been stated is the case here, inasmuch as there is an immense amount of the mortgage debt unpaid, for which there is a judgment of this court still unsatisfied. The valueless character of such litigation is set out in *Bayliss* v. *Lafayette, etc., Ry.* 8 Biss. 193, but evidently the court hesitated to dismiss the application, and was content to advise the parties that if the litigation should be fruitless, there was no practical value in it. I cannot assent to the doctrine that a trustee may thus escape an account, any more than that a court should refuse a judgment because it appeared that the execution would be returned *nulla bona.* An account against a trustee is almost always a matter of course. *Pulliam* v. *Pulliam,* 10 Fed. Rep. 23, 26. It will, however, only be granted at the suit of one having a right to the fund of which an account is asked. Neither can the fact that the defendant accounted with the governor, and received his commendation for the faithful discharge of a trust, assuming that we take judicial notice of the executive action in this regard, avail him as a defense. The act of 1852, under which he held his trust, does not make the executive department the exclusive arbiter of this trust, nor authorize it to acquit the trustee of all liability by approving his accounts. There seems to be no intention to deprive the courts of their powers in such matters, and the remedy on the bond of the receiver can only be concurrent with that of compelling a settlement through the medium of

a court of equity. If the act undertook to invest the executive department with exclusive power over the accounts of this receiver, it is, on well-settled principles, probable that the courts would pronounce it unconstitutional. *Jones* v. *Perry*, 10 Yerg. 59; Cooley, Const. Lim. 87–114, 392.

Other objections to the bill have been taken by the demurrer and in argument, which, for the present, at least, we will pass, and come to the substantial controversy between these parties upon this demurrer; and that is, the contention that the facts disclosed by the bill show that the plaintiffs have really no interest in the funds for which they allege the defendants are liable. Why take this account, say the defendants, when it appears that, as between the plaintiffs and the foreclosure purchasers, the funds in the hands of the receiver were the property of those purchasers? They insist that it is not pretended that he withholds them, or has appropriated them to his own use, but only that he has improperly turned them over to those purchasers, and that, even if he still retains them, they do not belong to the plaintiffs. If this be so, undoubtedly this bill should be dismissed. But there is some difficulty in determining it upon demurrer, by reason of the somewhat meager and indefinite statements of the bill as to the precise facts of the case, though both parties seem desirous of having the question determined, and have endeavored, by amendment, to make the bill more definite.

Generally, the facts are that this railroad having been constructed under the internal improvement laws of Tennessee, more particularly considered in the case of *Stevens* v. *L. & N. R. R.* 3 FED. REP. 673; *State* v. *E. & K. R. R.* 6 Lea, *supra,* and *Rogersville & J. R. R.* v. *Kyle,* 9 Lea, *supra,* the state held a statutory lien for the aid extended to it, paramount to all other liens whatever. Being in default for the interest and sinking fund due, under those laws, upon the state bonds it had received, the defendant Neely was, by the governor, appointed receiver to take charge of the road, and discharge the duties required by those acts of the legislature. While he was so in control of the road, it was sold by a decree of this court, under a foreclosure suit, to satisfy a very large mortgage debt, subordinate to the lien of the state for its debt. By the statutes and the decree, this sale was *cum onere,* and the purchasers took the title subject to the debt due the state. The purchasers organized a corporation, which, under authority of law, by subsequent consolidation and changes of name, became the present Illinois Central Railroad Company, a defendant to this bill. These purchasers liquidated the debt due the state by paying it off, principal and interest; how, does not precisely appear by the bill, except that it was done by buying the bonds of the state secured by its lien, which were paid in and canceled, the bonds being purchased at a heavy discount. But it is seemingly agreed in argument that they did this by taking advantage of the act of February 25, 1869, c. 38, p. 50, which permitted any railroad company to pay the

principal of the debt for which it was liable to the state, in any bonds of the state, for an equal amount, and authorized it to issue its own bonds to raise the money, which were to be secured by substituting these new bonds to the lien of the state in all respects. Also, any other person or corporation, with the consent of the railroad company itself, was authorized to pay the debt, issue its substituted bonds, and likewise be subrogated to the lien of the state. At the time of this liquidation of the debt due the state, it appears by the bill, as amended, that Neely was still in possession as receiver, and did not surrender the road to the purchasers until, in addition to the principal debt, they had paid to the state the sum of $94,234, past-due interest, accrued and not paid by him as receiver. This payment, and the $1,119,000 of principal due, constituted the sum paid by the purchasers to the state, and thereupon the receiver surrendered the road and all the assets and property in his hands to the purchasers. These figures may not be exactly accurate, but they serve to indicate the facts involved in the controversy. They are taken from the statements of the amended bill, which also refers to the answer of Neely accompanying his demurrer, and adopts certain paragraphs thereof, from which it will probably appear that, after deducting certain taxes paid, the correct amount of accrued interest paid by the purchasers was $85,811.27. It does not appear what, if anything, was due on account of the sinking fund. Neely made his report to the comptroller stating the amount of his receipts and disbursements; but complaint is made by the bill that he does not go sufficiently into detail, and that he files no vouchers with his report. This report is exhibited with the bill, which avers that Neely had on hand, as shown by the report, about $25,000 cash, and iron rails of about the value of $36,000, which he turned over to the purchasers. It further alleges that, well knowing that the company was insolvent, and that very soon the road would be sold, Neely used the funds in his hands very largely for making "permanent improvements not necessary for the operation of the road, and not coming within the designation of necessary repairs,—among other things, substituting steel for iron rails,—and that, knowing they could not be used, he invested in rails which were not placed on the track, but wrongfully turned over to the purchasers." In other words, the bill charges generally that Neely collusively improved the road out of the earnings for the benefit of anticipated purchasers, and seeks to hold him liable for these unnecessary improvements. The report itself, exhibited with the bill, shows that Neely, during the 20 months he held the road, received of its earnings $802,241.52, and paid out in "operating expenses" $570,303.18, and in "extraordinary expenses," $66,663.03, and to the state on account of interest due, $110,000. This left in his hands, after adding the value of fuel and supplies, on hand to the amount of $49,801.28, a sum aggregating $105,075.77. Against this he states that there was due from him on his pay-rolls the sum

of $32,409.35, for balances on supply bills, $34,887.59, and for balances due "on new rails purchased and being delivered," $34,000, leaving "an apparent net profit" of $3,778.83, which, he says, would be overbalanced by claims set up for damages for killing stock, etc. He further states in his report that the road having been sold, and the purchasers having satisfactorily liquidated the debt due the state, he transferred the property to them on November 28, 1877, "together with all assets in my hands, they assuming all my indebtedness as ascertained and adjusted, which they are paying promptly." He further explains that when he got the road in March, 1876, it was in a very dilapidated condition, and that, in order to make it earn the money due the state, he found it necessary to make "permanent improvements," and that he had put it in "first-class condition."

It is not averred in the bill (except in a general charge "that he has received and has never accounted for many thousands of dollars of said funds") that Neely received more or expended less than he reports to have done, and it is frankly conceded in argument that he is not accused of falsely stating this account. But it is insisted that he should have accounted, and should now be required to account more in detail and to file his vouchers. Manifestly, in equity pleadings, general accusations of fraud and collusion are ineffective. 1 Daniell, Ch. Pr. (5th Ed.) 324, and notes; *Riley* v. *Lyons*, 11 Heisk. 251; *Whitthorne* v. *St. Louis M. I. Co.* 3 Tenn. Ch. 147. The pleader should state the facts, and not formulate mere epithetic "charges." And it has been recently decided that the same rule applies at law. *Hazard* v. *Griswold*, 21 FED. REP. 178. If the facts are not to be ascertained by diligence, because of some obstruction, or if the evidence of them is in possession of the other side, this should be made to appear, with technical averments showing the necessity for discovery, where that is wanted; but a court cannot sustain a bill upon mere denunciatory statements of the plaintiff's suspicions or belief. The best pleadings are those which state the inculpatory facts that carry with them their own conviction of the fraud, and by which the wrong-doing appears, without much necessity for characterizing it as such. *Shepherd* v. *Shepherd*, 12 Heisk. 276.

This report evidently is subject to the complaint that it does not state the accounts properly supported by vouchers; and, other questions aside, it would not satisfy a court of equity; but it was not intended as an accounting in the strict sense, but only as a report of the receiver to the accounting officer, who should unquestionably, if he did his duty as such, have more thoroughly inspected and audited these transactions of an agent of the state in which others than the state had an interest; and the complaints of the bill against the executive officers, if true, are well founded, and show neglect of the plaintiffs' rights in the premises. And here I have hesitated whether or not a court of equity should not, for the mere satisfaction of complainants, require this receiver to pass his accounts in such a way that

they could see in detail what he had done while in charge of their property. But a court of equity must be able to see that there has been such a failure of the trustee in his duty to keep and exhibit his accounts that the plaintiffs have been injured, and there is no such showing by this bill. *Non constat* that Neely did not keep accurate and detailed accounts of his doings, which are open to the inspection of plaintiffs upon their demand, nor that they could not from this source obtain all the information they need to determine whether he has falsely stated them. And when in argument it is conceded that plaintiffs have no information that he has falsely stated them, it would seem unnecessary to take an account merely to satisfy them that the statements in this report were true.

We come, then, to the consideration of the questions growing out of the above-stated facts, which involve the substantial merits of this controversy. For the plaintiffs it is contended with earnestness and force that, inasmuch as the mortgage for the bonded debt of the company which was foreclosed did not include the earnings of the road, those accumulated in Neely's hands did not pass to the mortgagee or the purchaser, and when the sale took place, subject to a prior lien, the purchaser so regulated his bid as to obtain the property at a price which would enable him to discharge the prior lien and give that sum for it. In other words, that in buying the property subject to the prior lien these purchasers assumed that debt, expected to pay it, and put their price accordingly, and now have no equity to demand that, as between them, the other property of the mortgagor shall be applied to ease their burden by paying the debt which they are equitably bound to pay out of their own means. For this principle the main case relied on is that of *Pickett* v. *Merchants' Bank*, 32 Ark. 346, which, so far as relates to this question, was a suit by the mortgagor against the mortgagee to overhaul a bank account for usury. There had been a sale of the mortgage property, and it had been purchased by the mortgagee under an agreement between the parties as to the application of the proceeds of sale to certain prior incumbrances and then to the mortgagee's own debt. But there was an incumbrance for delinquent and unpaid taxes, paid by the mortgagee after the sale, which had not been included in the agreement, and when the mortgagee was about to enforce his lien upon other lands for the balance due, the controversy arose as to the true amount of that balance. It was held that the mortgagee had purchased *cum onere*, and was not entitled to a credit for the taxes paid. "When the warehouse property was sold," says the court, "it was incumbered with unpaid taxes, and, as we presume, was purchased for less on that account." Other authorities are cited for this position, but it is not necessary to cite them here, as the court, for the purposes of this decision, fully concedes the force of the position.

On the other hand, it is insisted that when a junior mortgagee purchases under a foreclosure sale the mortgagor's equity of redemp-

tion, he is entitled, as against a senior mortgagee in possession, to the same account of rents and profits that the mortgagor could have had. This seems, also, to be well settled by authority. There is sometimes much difficulty in the application of the rule, because the peculiar facts of the case leave it uncertain where the rents and profits of mortgaged premises belong, notwithstanding the possession of the mortgagee; and sometimes, by the agreement of the parties, or other like intervening circumstances, the rule which ordinarily obtains is displaced. Indeed, the local law of the state often interferes to regulate the incidents of the mortgage, and affects this as well as other rules governing the relation of mortgagor and mortgagee. Mr. Pomeroy has very ably shown how the law of mortgages has been thus changed in many of its incidents by local law. Pom. Eq. §§ 73, 74, 162, 163, 1179–1191. Making allowances, however, for such deviations, the rule contended for by the defendants is well established. *Harrison* v. *Wyse*, 24 Conn. 1; *Kellogg* v. *Rockwell*, 19 Conn. 446; *Childs* v. *Childs*, 10 Ohio St. 339; 2 Jones, Mortg. 1070–1085. I do not find any Tennessee case in which the point has been considered, but generally in this state the ordinary law governing the relation of mortgagor and mortgagee in a court of equity prevails. *Henshaw* v. *Wells*, 9 Humph. 568; *Vance* v. *Johnson*, 10 Humph. 214; *Bidwell* v. *Paul*, 5 Baxt. 693; 1 Meigs, Dig. (2d Ed.) § 527, subsecs. 7, 9, 10; 3 Meigs, Dig. (2d Ed.) §§ 1984, 1987; 1 Pom. Eq. § 163; 3 Pom. Eq. § 1187, p. 158. In an account between the mortgagor and mortgagee, the mortgagee in possession, while accounting for rents, is credited with permanent improvements, necessary expenditures, taxes, insurance, and prior incumbrances paid by him. *Leiper* v. *Ransom*, 2 Cold. 511, 514; *Bradford* v. *Cherry*, 1 Cold. 60; *Kellogg* v. *Rockwell*, supra.

But these two propositions of the plaintiffs and defendants, respectively, are not antagonistic to each other. While the purchaser buys the property *cum onere*, unless there is something in the agreement of the parties, as in *Bank of U. S.* v. *Peter*, 13 Pet. 123, and *Belcher* v. *Wickersham*, 9 Baxt. 111, or some other attending circumstance to control it, he only agrees to pay what is due to the prior mortgagee on a proper accounting with the mortgagor at the time of his purchase. Presumably, that is the sum he takes into his calculations when he makes his bid, and not a larger sum which may apparently be due; unless, as before stated, the amount is fixed beforehand, in which event that is the sum he must pay at all hazards. Assuming, then, that these purchasers bought the equity of redemption at the foreclosure sale, as we must if it was a foreclosure sale strictly considered, and that our statutory redemption has been by the decree barred, or has lapsed by the long time over the statutory two years allowed for redemption which have passed since the sale in August, 1877, it is the purchasers who are entitled to this account and the proceeds of it, and not the original mortgagor. In the Arkansas case

relied on by the plaintiffs the tax incumbrance had been overlooked by the purchaser, and on the principle that he had bought *cum onere*, he had that incumbrance to pay, as these purchasers did the debt of plaintiffs' company to the state. But surely, in that case, if there had been a dispute about the amount of the taxes due on the warehouse, and it had been made to appear that by payments made by the mortgagor the amount of taxes was only, say, $1,000, instead of the $2,473, the difference would have inured to the benefit of the purchaser, and not to the mortgagor, by requiring the purchaser to pay to him the balance of $1,473. If, indeed, the parties had agreed before the sale that the larger amount of taxes was due, and the bidding had been predicated on that understanding, but subsequently it was found to be less that was paid to the tax collector, the difference would belong to the mortgagor, to be paid to him or credited on the mortgage debt; but this bill has no feature like that, and such a claim could not be set up here.

It is not necessary, if this be a correct view of the equities of the parties, to say more than that the result is that plaintiffs show no such interest in the fund alleged to be due as entitles them to the account they seek, and consequently the demurrer should be sustained, and the bill dismissed for want of equity on the face of it. But, if we look at the equities of the parties in a broader view, the same judgment must be reached. Evidently, after paying out of the funds in his hands the balances due by him for expenditures that will not be disputed, the receiver should have paid the remainder of the fund to the state on its claims for over-due interest and sinking fund. Instead of doing this he used the money to improve plaintiffs' property, and presumably they got the benefit of it in a higher price, and consequent greater reduction of their mortgage debt. How can they complain at this? Again, the receiver having allowed the interest claim of the state to remain unpaid to, at least, $85,000, and, perhaps, counting the sinking fund, largely more, these purchasers have paid it in order to relieve their property of the lien for it. Now, upon the plainest principles of subrogation, as between the mortgagor and these purchasers and this receiver, whatever be held in cash, or was liable for by improper management, was a fund primarily liable (and known to be such by the purchasers when they made their bid) for payment of the accumulated interest and sinking fund, and they are entitled to have it so applied. The authorities already cited establish this. The mortgagor would be only entitled to the surplus, and it is plain there could be no surplus in this case on the facts already stated.

Now, this fund has been so applied, on an agreement between the state, the purchasers, and the receiver, by his turning over the assets in his hands, and they paying the interest; and it is quite manifest that they have not received more than was due after paying the charges on the fund. That the receiver expended some of the money

in improvements that were permanent, and rails that were delivered but not fully paid for, cannot, as before intimated, be a cause of complaint, if it enhanced the value of the property. But more than this, he was, by the general law and the statutes under which he acted, invested with plenary powers in the matter of managing the road; and, as it appears, this 117 miles was only a link in a great line of transportation, he could not earn sufficient money to pay the interest unless he did improve it; and it is certain that this policy was the best for the state, whose claims, under the statute he was executing, were paramount in importance to any interest of the stockholders. He may have known that the company was hopelessly bankrupt, and that the road must pass into other hands; but the interests of the state were his chief concern, and this consideration should have had no influence with him. He was not bound, as the plaintiffs seem to think, to withhold all expenditures for improvements which would increase his earnings, because it was more desirable to them that he should reserve the money for the other uses of the bankrupt owners. They have received the full benefit of the earnings in their payment of the interest debt to the state, for which they were pledged. They have the benefit of the improvements in the reduction of their mortgage debt, and this is all that, honestly, they can ask. They might have managed differently. They could have used the earnings for the purposes of dividends, allowed the road to run down, and thereby left a larger debt due from an insolvent company, both to the state and their own immediate bondholders. But perhaps it was a fear of this kind of management and its temptations that induced the governor to appoint a receiver; that induced the legislature to make provision for one; and that made a foreclosure desirable. At all events, it does not lie in the mouth of plaintiffs to complain that the receiver did not thus manage in their selfish interest. The interests of the creditors, state and private, demanded, as did the material interests of commerce, which prompted the public aid given these plaintiffs, that the receiver should manage as he did.

Finally, this case has been heretofore considered under the general principles of equity governing the relation of the parties, but it is impossible to read the acts of the legislature already cited, which regulate the rights of these parties, and not feel that these principles are greatly strengthened and enlarged by those acts. By the act of 1869 these purchasers were permitted, with the consent of the company, to liquidate the debt due the state and be substituted to the state's lien. They did liquidate that debt, obtaining presumably the plaintiffs' consent through their corporate representatives; and to allow them now to divert this fund from the payment of the interest due the state, on the theory of this bill, would be to allow them to repudiate that consent and its consequences. This act substituted the purchasers to whatever right the state had to the funds in Neely's hands, and there was not more than enough to pay the state, on the facts of this case.

The state had a lien on the earnings, certainly, and it passed to the purchasers under this act of 1869, and if Neely has anything for which he should account, it belongs to them.    Act 1869, *c.* 38, p. 50. As to the plaintiffs, who are creditors, they can occupy no higher ground than the stockholders in the matter of demanding an account. Indeed, it may be doubtful if judgment creditors are ever entitled to an account against a prior mortgagee in possession.   *Worthington* v. *Wilmot,* 59 Miss. 608.   But as to this we need not now inquire, the questions decided being as conclusive against the creditors as the stockholders.

There are other grounds of demurrer, some relating to those plaintiffs who are creditors, but no further notice will be taken of them, since, on the ground above indicated, the demurrer must be sustained, and the bill dismissed at the costs of the plaintiffs.

Decree accordingly.