RICHARD M. FUNCK, Appellee, v. FARMERS ELEVATOR COMPANY, of Gowrie, Iowa, C. J. SETTERSTROM, its Secretary, and G. A. SELL, its President, Appellants.

Conspiracy: EVIDENCE. A combination for the purpose of injuring or destroying the trade or business of another by preventing any and all persons from dealing with the party through fear of incurring the displeasure, persecution or vengeance of those composing the combination, is an unlawful conspiracy. Evidence held to show that plaintiffs purchase of stock in defendants. corporation was in furtherance of a conspiracy to destroy defendants business.

**Same:** CORPORATIONS: TRANSFER OF STOCK: MOTIVE OF PURCHASER. Ordinarily the motive of the purchaser of corporate stock in seeking to compel a transfer of the same on the books of the corporation will not be inquired into; but where the evidence shows that the purpose of the purchase and proposed transfer is to aid in an active conspiracy to ruin the corporation or drive it out of business, and that the purchaser seeking the transfer is the mere tool of the conspirators, a transfer of the stock will not be ordered. ·

**Same:** *Mandamus*: RELIEF ON REFUSAL OF WRIT. Where the court in *mandamus* refuses to compel the transfer of stock on the books of a corporation, because the same is in furtherance of a conspiracy to ruin the company, it will not order judgment on defendants tender of the value of the stock but will leave the plaintiff where it finds him, because of his participation in the fraud.

*Mandamus*: NATURE OF REMEDY: EQUITABLE RELIEF. Under the statute a *mandamus* proceeding is triable in equity, so that although a proceeding in equity rather than *mandamus* may be the proper remedy to procure the transfer of corporate stock on the books of the company, still the style of the action is not material; and if the action of *mandamus* has been instituted the petition may be amended so as to invoke general equitable jurisdiction. ·

Deemer and McClain, J. J., dissenting.

*Appeal from Webster District Court.*—HON. C. G. LEE, Judge.

FRIDAY, MAY 14, 1909.

THIS is a proceeding by *mandamus* to compel the transfer of stock upon the books of the defendant company. Decree and judgment for the plaintiff, and the defendant appeals.—*Reversed,* and case *dismissed.*

*Healy & Healy* and *T. D. Healy,* for appellants.

*Read & Read,* for appellee.

EVANS, C. J.—The plaintiff brought two actions

against the defendant company; the one sought a writ to compel a transfer upon the books of the company of stock owned by the plaintiff, and the other sought an order to compel the defendant to permit the plaintiff to examine the books. By agreement of parties the two actions were consolidated and tried together on the equity side of the court. The trial court, by written opinion filed, found that the plaintiff was "a malicious meddler," and that he purchased his stock, and sought membership in the defendant corporation, for the purpose of betraying it to its competitors. The trial court, therefore, refused an order permitting him to examine the books of the company, but held that he was entitled to a transfer of his stock upon the books of the company as a matter of absolute right, and it entered judgment accordingly. From this judgment the defendant has appealed.

The defendant is a corporation for pecuniary profit, organized in the ordinary way. Its principal place of business is Gowrie, Iowa. The general plan of its promoters was that its stock should be owned and controlled by the resident farmers, to whom it looked for its patrons and customers. The general scope of its business is to buy and sell farm produce and lumber and coal. It appears from the testimony with reasonable certainty that an organized system of "boycott" has been applied to the defendant for several years by so-called "regular" dealers. These "regular" dealers are organized into associations. It is a part of the course of conduct of some of these associations, through their officers, to ascertain what wholesale and jobbing and commission houses do business with the defendant and other like corporations. For that purpose a system of espionage on their business has been adopted. When the name of a jobbing or wholesale house is discovered which does business with the defendant, some form of coercion is resorted to, to cause them to desist. The re-

1. CONSPIRACY: evidence.

sult is that, in order to do business at all, the defendant is compelled to keep secret the names of the persons with whom it deals at jobbing and wholesale centers. Much of the time it is unable to buy the supplies needed for its trade, solely because of such "boycott." At the time of the trial there were only two sources available to it from which it could obtain lumber, and it was able to maintain these sources only by keeping the names of its sources secret. In order to prevent the ascertainment of the names of persons from whom it buys shipments, and to whom it sells shipments, it has had to adopt a system of initials and reconsignments. Every time that it loads a car of grain for shipment, its competitors take the number of the car and the initials thereof. Several letters are contained in the record which have been written by officers and members of these associations, which strongly confirm the claim of the defendant as to the alleged boycott. We think it may fairly be said from this evidence that the parties engaged in such boycott are guilty of an unlawful conspiracy to destroy the business of the defendant, or else to coerce it into maintaining an approved scale of prices.

The plaintiff is a young man, twenty-six years of age, without a habitation, and without an occupation. He is not a farmer. Prior to the purchase of the stock in question he never had any acquaintance about the town of Gowrie. He employed one Woodward, to purchase four shares of stock for him. These were obtained for $50. Twenty dollars was paid as a commission to Woodward. Immediately upon the purchase of the stock the plaintiff demanded an investigation of the books, and, this being refused, he brought suits, as before stated. The plaintiff was examined at the trial below at great length by the defendant's counsel. It would extend this opinion to too great length to set out the testimony in detail. It is sufficient to say that it leaves no doubt in our minds but that

the plaintiff was and is acting in behalf of the persons guilty of the boycott, and in furtherance of the conspiracy in which they are engaged against the defendant.

The question that confronts us is, Is he entitled to the aid of this court to any extent in carrying out the unholy purpose?   It is undoubtedly true that the mere motive of the purchaser of corporation stock will not ordinarily be inquired into, nor be deemed material by the court in a proceeding to order the transfer of stock on the books of the company. *Carson v. Iowa City Gas Company,* 80 Iowa, 638.   To our minds this case presents something more than the mere motive of the plaintiff. The evidence discloses an active conspiracy, which it would be the duty of the court to enjoin if proper jurisdiction could be acquired.   Can a court consistently enjoin and punish a conspiracy with one hand, and aid and abet it with the other?   It is true that the plaintiff asks nothing in this case that is of itself illegal.   If this transaction stood alone, the plaintiff would have the absolute right to the relief demanded, as held by the trial court. But must the court aid a conspiracy to its final goal simply because it travels this part of the way over a legal highway?   We think not.   In the light of the evidence the plaintiff does not stand before the court as a mere purchaser of stock in the defendant company, but as a conspirator, or a puppet of conspirators, working in conjunction with many others by unlawful means toward an unlawful end.   A conspiracy usually, often necessarily, involves in its details many lawful acts; that is to say, acts which in themselves would be lawful.   They are none the less unlawful as parts of the plan of conspiracy.   It is our conclusion, therefore, that the plaintiff is entitled to no aid from a court of equity, and that the relief prayed for should be refused.

We may observe at this point that the court is not

in full agreement upon this proposition. After a careful consideration and discussion of the question involved we find ourselves in final disagreement, and a dissenting opinion is filed herewith. In view of the adverse opinion of the minority it is desirable that consideration be given herein to the authorities in other jurisdictions. The dissenting opinion assumes that the case involves the question only of the motive of the plaintiff as purchaser of the stock, and nothing more. If this is a correct assumption, we find no fault with the resulting argument. To the general proposition that a court will not inquire into the mere motives of a litigant where they form no element of the case, the majority takes no exception. If there is no difference between a case involving a mere unworthy motive and a case involving actual aid to the purposes of an existing conspiracy, then the majority has misconceived the controlling question in the case. In a legal sense a conspiracy is something more than mere. motive, although motive is an essential part of it. So far as applied to this case it is defined by our statute as follows (Code, section 5059): "If any two or more persons conspire or confederate together with a fraudulent or malicious intent wrongfully to injure the person, character, business, property or rights in property of another . . . they are guilty of a conspiracy, and every such offender and every person who is convicted of a conspiracy at common law shall be imprisoned," etc. At common law conspiracy to injure a person's trade or business was an indictable offense. See 8 Cyc. 637, and authorities cited. Likewise a conspiracy to boycott, namely, "a confederation, generally secret, of many persons, whose intent is to injure another by preventing any and all persons from doing business with him through fear of incurring the displeasure, persecution, and vengeance of the conspirators. The character of agreement included in the term defined [boycott] is highly unlawful, and is an indictable conspir-

acy." 8 Cyc. 639, and authorities cited. *State v. Glidden,*
55 Conn. 46 (8 Atl. 890, 3 Am. St. Rep. 23); *State v.
Stuart,* 59 Vt. 273 (9 Atl. 559, 59 Am. Rep. 710);
*Crumps Case,* 84 Va. 927 (6 S. E. 620, 10 Am. St. Rep.
895).

For the purpose of the case at bar it matters none
whether the plaintiff be deemed a conspirator in a strict-
ly criminal sense, or a mere puppet, put forward by con-
spirators to act under their direction. The dissenting
opinion assumes that the defendant's answer alleges noth-
ing more than wrongful motive on the part of plaintiff.
But its answer is quite as comprehensive and explicit as
the answer in *Gould v. Head* (C. C.) 41 Fed. 240. In
the cited case it was held that the answer presented a com-
plete defense. The defense presented the identical ques-
tion involved here. It was decided by the court upon de-
murrer to the answer. We quote the following from the
opinion:

I am of the opinion that the last matter of defense
pleaded in the answer contains matters of substance which
ought to be investigated before the court should order a
certificate to be issued in the name of the complainant as
prayed for. If he has paid no value for the possession of
the stock claimed by him, and he is lending himself to a
conspiracy to enable the parties named to hold and con-
trol the properties of Phoenix Cattle Company with the
view of wrecking it, and thereby diminishing to that ex-
tent the value of respondent's stock in the American Cattle
Trust, the plaintiff should have no standing in a court of
equity to assist him to a position the better to accomplish
the contemplated wrong. If he is an innocent purchaser
for value and in good faith, he can show it; and, if his
claim is merely simulated, and he has acquired possession,
as the agent and instrument of the trust company, to en-
able them to perpetrate a fraud or wrong upon the rights
of the respondent as a stockholder, it seems to me that
this court ought not to compel the respondent, as president
of the Phoenix Cattle Company, to execute to him a new

certificate of stock, but the court should leave him where his own wrong has placed him.

The general state of the law on this question is set forth succinctly in Helliwell on Stock and Stockholders (section 165) as follows:

The duties of a transfer clerk are purely ministerial, so far as they pertain to the transfer of stock, and he has no authority to inquire into the motive of a transfer. This question has arisen perhaps most frequently where stock has been transferred for the purpose of conferring the voting power on the transferee. Where in such case the transfer has been shown to be *bona fide,* it has been sustained, although evidently made for the purpose of securing to the transferee and his friends control of the corporation; no intent to oppress the minority stockholders appearing. Where, however, the party seeking a transfer of stock has paid nothing therefor, and is seeking the stock in furtherance of a conspiracy to wreck the company, a court of equity will not assist him in the accomplishment of the proposed wrong. So, also, cases may arise in which the primary object of holding stock is the enjoyment of certain privileges, conferred by the corporate charter upon the members. Where this is the case, it has been held that the corporation may refuse to register a nominal transfer.

The question under consideration was involved in the English case of *Forrest v. Railway Company,* 4 De Gex, F. & J. 126. We quote therefrom: "To use a familiar expression, plaintiff is the puppet of that company. . . . But can I permit a man who is the puppet of another company to represent the shareholders of the company against whom he desires to establish the interests and benefits of a rival scheme? . . . I treat this suit as an imposition on the court. . . . I dismiss it accordingly, and affirm the order that has been made, though on a different ground."

Many authorities hold that a person purchasing stock

for the purpose of bringing a suit is not favored by the courts. *Kingman v. Railway Co.,* 30 Hun (N. Y.) 73; *Hawes v. Oakland,* 104 U. S. 461 (26 L. Ed. 827); *Robson v. Dodds,* 8 L. R. Eq. Cases, 301; 3 Cook on Corporations, section 736, and cases cited thereunder.

It will be noted, by an examination of the cases cited in the dissenting opinion, that none of them deal with the question of conspiracy, and some of them expressly recognize the distinction which is contended for here, but which is ignored in the dissenting opinion.

Referring to *Rice v. Rockefeller,* 134 N. Y. 174 (31 N. E. 907, 17 L. R. A. 237, 30 Am. St. Rep. 658), which is cited in the dissenting opinion as the most decisive case, it will be noted that no defense of conspiracy was pleaded. Nor is the opinion in that case inconsistent with the views herein announced. On the contrary, it recognizes the rule laid down in some of the authorities cited herein. We quote from page 910: "The party seeking relief must come into court with clean hands, as such maxim is understood in its application to that relation. If, for instance, he appears there under false colors, his complaint may for that reason, be dismissed. Such was the case of *Forrest v. Railway Company,* 4 De Gex, F. & J. 126. There a party filed his bill, in behalf of himself and all other shareholders of the defendant company, to restrain it from running its vessels, etc. It appeared at the trial that he was also a shareholder in a rival company; that by its direction he instituted suit, and by it was indemnified against costs. The bill was dismissed," etc.

Referring to *Senn v. Union Premium Co.,* 115 Mo. App. 685 (92 S. W. 507), the question of a conspiracy was not involved in this case. But the opinion therein is instructive, and it recognizes the distinction between the case therein made and cases involving conspiracy. We quote a few excerpts therefrom to this effect. After stat-

ing the general proposition that the assignee of stock is entitled to a transfer of it upon the books of the company as a matter of right, it proceeds:

But this relief is not technical nor absolute, and circumstances occasionally surround an assignment of corporate stock which induce courts of equity, in the exercise of a conscientious discretion, to refuse to recognize the assignee as a shareholder, and entitled to all the rights pertaining to that status, and even to withhold a decree against the corporation commanding that the stock be registered in his name. 2 Townsend on Corporations, section 2431. Where stock has been transferred to a person to enable him, as a mere puppet of the transferror, to institute and carry on litigation for the latter's benefit, or to wreak his spite, a court of equity will not tolerate the litigation; and it seems likely would decline to decree a transfer of the shares on the company's books. . . . An examination of the cases dealing with this subject will show that, for the assignee to be denied recognition of his full rights as a shareholder, it must be shown that he is acting in behalf of another. If he is acting in his own behalf, he is accorded recognition, though his motive may be unworthy. . . . In *Gould v. Head* it was held to be a good defense to a bill to compel the registration of shares that the shares were acquired by the complainant without any consideration, for the purpose of enabling the complainant to participate in a conspiracy, formed by third parties, to get control of the company for the purpose of wrecking it, and thereby diminishing the value of shares in another company with which the company to be wrecked was affiliated in business. The decision was put on the ground that the defense as pleaded showed the complainant was the agent and instrument of conspiring third parties. . . . To defeat the right in a given case it ought to be shown that the pretended owner of the shares is not their real owner, or clearly shown, at least, that he is seeking the transfer for a purpose whose accomplishment is possible, and which is so iniquitous that a court of equity will decline to aid it. We have found no instance wherein the court refused to compel a transfer, when a petitioner actually owned the stock, on the ground that his object

was bad, except when the object was to institute litigation
for the benefit of third parties, etc. . : . In the other
cases we have cited, wherein complainants were denied re-
lief because suits had been instituted at the instigation of
third parties, the complainants held the shares in their own
names, and it was litigation begun by them as shareholders
that the courts held would not lie, because the suits were
brought to redress no grievance of the complainants, but
to assist an unworthy purpose of their confederates. Still
we apprehend that stock might be acquired for some pur-
pose so unconscionable that equity would refuse to compel
a transfer, though no litigation was contemplated.

It will be seen, therefore, from the foregoing excerpts
that the cited case is in no sense inconsistent with the ma-
jority holding in the case at bar. To the view of the ma-
jority many of the cases cited in the dissenting opinion
are quite beside the real question involved, and are not
fairly applicable to the discussion, either in fact or argu-
ment. This remark is specially applicable to the following
cited cases:  *State v. Smith,* 48 Vt. 266; *Helm v. Swig-
gett,* 12 Ind. 194; *In re Klaus,* 67 Wis. 401 (29 N. W.
582).

It is suggested in the argument of appellee that, if
the relief prayed for be refused him, he should be allowed
to take judgment upon defendant's tender to pay the value
of the stock. The plaintiff has never need-
ed the aid of the court to accept this tender.
He holds the certificates of stock, and has
never offered to surrender the same, nor
does he make such offer now. The grounds upon which
we deny relief to plaintiff are as applicable to one form of
relief as to the other. He has been able to proceed so far
toward his objective without the aid of the court. He
now calls for judicial furtherance. He can not obtain
it. We can only leave him where we find him. We im-
pose no command upon him, nor interpose any obstacle to
his acceptance of the offer of the company.

3. SAME:
   *mandamus:*
   relief on
   refusal
   of writ.

II. There is some controversy between counsel as to whether an action of mandamus will lie for the purpose of ordering a transfer of stock. The authorities are in much conflict on that question. For a collation of cases *pro* and *con,* see Cook on Corporations, sections 386, 390-392, 736, with notes and citations. The weight of authority seems to favor a proceeding in equity, rather than *mandamus,* for that purpose. In this State the action of *mandamus* is purely statutory, and it has become farther and farther removed from the historic action. By recent enactment of the Legislature it is now triable as an equitable action, and this case is now pending on the equity side of the court. Inasmuch, therefore, as an action of *mandamus* is on the equity side in any event, the question discussed is without much practical importance. If the facts of a given case require the exercise of the more general jurisdiction of a court of equity in order to do justice to the parties, we see no reason why such general jurisdiction might not now be conferred by mere amendment of the pleadings. On the other hand, we see no reason why the mere form of the action should require a court of equity to grant a writ of *mandamus* if upon the merits it would refuse equitable relief for a like purpose. On either theory the plaintiff is in a court of equity, and must show clean hands even to obtain a writ of *mandamus.*

4. *Mandamus:* nature of remedy: equitable relief.

The plaintiff's case must be dismissed, and the judgment below will be *reversed.*

DEEMER, J., dissenting. The right to have the last word is not a privilege to the fair sex alone, but is always safeguarded to` a dissenter from the conclusions of the majority of the court. It is a little strange to find those upholding the affirmative, building up a proposition by an attempt at the destruction of a negative; and it is still more strange to find the majority adopting the minority rule, and yet citing cases in support of it in favor of their

conclusions; and it is still more unusual to find, in examining the cases cited, that but a single one lends any support in what is actually decided to the conclusions of the majority, and to find that that case is a decision of a federal district judge, sitting at *nisi,* in ruling upon a demurrer to a petition. I refer to *Gould v. Head* (C. C.) 41 Fed. 240, opinion by Phillips, District Judge. *Forrest v. Railway Co.,* 4 De Gex, F. & J. 126, does not touch the question involved. That was a suit where plaintiff filed a bill, on behalf of himself and all other shareholders in a railway company, to enjoin the company from running steam vessels in a manner which he alleged to be *ultra vires.* What this has to do with the transfer of stock upon the books of the corporation I have been unable to see. However, even in that case it is said: "I have nothing to do with the motives of plaintiffs suing in this court. If they come here in a *bona fide* character, the reason for their coming is a matter beyond the province of a court of justice to inquire into." *Kingman's* case, 30 Hun (N. Y.) 73, was an action by a person buying stock, who sought an injunction challenging the past wrongful acts of directors. It was said that plaintiff and his assignors bought into the company for the purpose of bringing the suit and carrying on that litigation, and it was held that he was not entitled to any favor of the court. Further it was said that the plaintiff's rights were at law for damages for the injury they may have sustained. It in no manner involved the right of a purchaser to have his stock transferred upon the books of the company. *Robson's* case, 8 L. R. Eq. Cas. 301, was a suit by a plaintiff having only a nominal interest, on behalf of a body of stockholders, at the instigation of another person, who indemnified the plaintiff against the costs of suit. It was to restrain certain proceedings of the board of directors, which were alleged to be *ultra vires.* Certainly this case is no authority for the conclusion of the majority. There

is then but the single federal case which gives any sort of support to the majority opinion, and that has been so often discredited as that it should not pass for authority.

We come then to the exact proposition involved in this appeal. As I see it, plaintiff is denied the relief asked by him, which ordinarily would be granted as a matter of right, because of his motives or purposes in the future. He did not purchase his stock from the defendant, but from one who had the right to sell, and of one from whom he had the right to buy. The defendant can not be prejudiced in any way by this sale, or by a transfer of the stock upon the books of the company, unless some supposed purpose or intent is carried out by the plaintiff in the future by the unlawful use of property which he had an unqualified right to buy. Plaintiff had, in my opinion, an unquestioned legal right to have the transfer of the shares regularly entered upon the books of the company. This is for his protection as against everybody save the man who sold this stock to him. As a justification for its refusal to transfer the stock the defendant pleaded:

That in presenting the said bill of lumber, and in making inquiries as to the purchasing of stock, defendants allege that plaintiff was acting for and in behalf of rival corporations the exact names of which are to these defendants unknown, and that plaintiff was not acting in good faith, but had for his purpose the intention to destroy and break up said corporation; that the plaintiff furnished no money to buy said stock, but that the same has been furnished him by other parties, and that the only purpose of plaintiff becoming a stockholder was to enable him to see the books and accounts of the defendant corporation, procure the names of the persons with whom the said corporation was doing business, with the intention and purpose on his part to institute boycotting and blacklisting proceedings against wholesale dealers who would sell supplies, lumber, coal, and machinery to the defendant corporation; that the plaintiff had conspired and confederated with other persons, the exact names of which are to these

defendants unknown, to in some manner obtain possession of a share of the stock in the defendant corporation, with the purpose and intention of harassing and annoying the defendant by litigation, and procure information for the sole purpose of applying for the appointment of a receiver, in order to destroy the credit of the defendant corporation, and with the further purpose of preventing the defendant corporation from purchasing supplies from wholesale dealers. The defendants further allege that the plaintiff is engaged in no legitimate business, is a young man just out of school, and has been employed by rival corporations for the sole purpose of attempting to obtain membership in farmers' co-operative societies for the purpose of learning with whom the said societies do business, obtain secret information in relation thereto, reveal the same to his employers, and his sole purpose in purchasing said shares of stock, and in beginning this litigation, has been to harass and annoy, and, if possible, impair the credit and break up the said corporation. And these defendants aver the fact to be, as they verily believe, that this plaintiff is acting for and in behalf of a lumber and grain company of Mason City, Iowa, whose sole purpose is to get the names of wholesale dealers with whom this defendant corporation is doing business, in order that the said wholesale dealers may be prevented from selling this corporation lumber or supplies; that the plaintiff knew of the difficulty that this defendant and other farmers' co-operative societies had in purchasing lumber, and other articles of merchandise, and of the attempts made by lumber, coal. and other trust organizations to prevent this defendant from obtaining supplies, and he negotiated for the purchase of the stock mentioned in his petition for the sole purpose of enabling him to destroy the defendant corporation, or to impair its credit by beginning suits for no lawful purpose, but solely to harass and annoy the defendants herein, and defendants state that in order to do equity and place the plaintiff in as good, or better, position than he was prior to the purchase of this stock, although the plaintiff paid but $50 for the said stock as alleged in his petition, these defendants now offer to pay him, and hereby tender in to court, the sum of $100, and interest thereon at 6 percent, since the date of the said purchase, and all for the use and benefit of the plaintiff herein.

To my mind this pleads nothing more than a charge that plaintiff's motive and purpose in purchasing this stock was for the benefit of a rival corporation, and with the motive, purpose, and intent of doing, or attempting to do, some injury, real or supposed, to the defendant corporation. That this is not a sufficient defense to this action is held, I think, in *Carson v. Iowa City Gaslight Co.*, 80 Iowa, 638.

In an English case of *Moffatt v. Farquhar*, 7 L. R. Ch. Div., 605, this matter was before the court, and it was there said:

The question, therefore, raised, and the only question that I have to decide is, what is the power of the directors in vetoing or forbidding the transfer of the shares? Now that entirely depends upon the eighty-second clause of the deed of settlement of the company. The only power which is given by that section to the directors of objecting to the transfer is as to the person of the transferee. If the person, or persons, proposed shall be approved of, then a transfer of the shares is to take place. In my opinion, therefore, it is perfectly clear there can be no justification for refusing the transfer, unless they have an objection to the person of the transferee. That they should have such a power seems reasonable, because, this being a limited company, and it being very desirable that they should have respectable men and solvent men as members, and persons who would be able to pay the calls which should be made, it is reasonable that they should have the power of objecting to the person, and not have introduced among them insolvent persons, or, it might be, if you like, disagreeable persons, who would throw them into confusion; and therefore the directors have the power of objecting to the person. Certainly there is in my opinion no other power of objecting to the transfer, and if, therefore, a proper transferee is proposed, I take it to be perfectly clear that the proprietor has a right to transfer his shares to whomsoever he likes, and the board has no right whatever to inquire into what the object of that transfer is. Now this is most important, because here is a case in which the nominal value of

the plaintiff's shares in this company amounts to £60,000. This right of transfer is a right of property; and, if the directors have an arbitrary power, from any fancy they choose to take up, to say there shall be no transfer, that is an annihilation of property. A man may have embarked too much in becoming a member of the company, and in a case of emergency he may be required to sell his shares fairly in the market to a person of unexceptionable character; but, if the directors have the power of vetoing the transfer because they conjecture there is some collateral object, the value of the property is diminished—the marketable value is gone—and therefore the transfer in these joint-stock companies is a right of property, which right of property must not, and can not, be lightly interfered with. Such are the views which have been taken in all the cases that have occurred. It is always treated as a matter of property; and, where a matter of property is concerned, it must not be lightly interfered with.

Vice Chancellor Bacon (1) Law Rep. 16 Eq. 562, said:

'In my opinion I can not refuse to make the order which is asked. The applicants are the owners of shares— a class of property of which one of the incidents is a right to transfer it—a right to make a present and complete transfer of it. It is the duty of the directors to receive and register that transfer, or to furnish some reason for refusing to transfer.' Then he says that no ground whatever had been assigned which would excuse nonregistration, except a desire to exclude the applicants from the exercise of that which was their plain legal right, and he not only grants the application to have the shares registered, but directs them to be registered before the following Monday, when the meeting was to be held, on the ground that, if the application was not granted in that shape, the sole object for which the transfers were made would be frustrated. Now there the transfer was enforced, although the avowed object was to increase the voting power in respect of the shares transferred.

In Shortridge v. Bosanquet, 5 H. L. C. 297, it was

said: " 'It would be a very serious thing for shareholders in one of these companies to be told that their shares, the whole value of which consists in their being marketable, and passing freely from hand to hand, are to be subject to a clause of restriction which they do not find in the articles, and I may add that, if we were to hold that such powers were vested in the directors, it would be a very serious thing for them, and would impose upon them much more onerous duties than any which are really imposed upon them by this clause.' That fully recognizes the right of every shareholder, in respect of his right of property, to transfer his share fairly, and without any restraint on the part of the directors." In *Pender v. Lushington,* 6 C. H. Div. 75, it was said: "In all cases of this kind, where men exercise their rights of property, they exercise those rights from some motive adequate or inadequate, and I have always considered the law to be that those who have the rights of property are entitled to exercise them, whatever their motives may be for such exercise."

In *People v. Paton,* 5 N. Y. St. Rep. 313, this question arose, and it was said:

Under chapter 165, page 205, Laws 1842, it is the absolute duty of a transfer agent, in this State, of any moneyed or other corporation existing beyond the jurisdiction of the State, to exhibit, at all reasonable times during the usual business hours, to the stockholders, when required, the transfer book, and a list of the stockholders, if in his power so to do. *Kennedy v. Chicago, R. I. & P. R. R. Co.,* 14 Abb. N. C. (N. Y.) 326. This proceeding is brought under that act, and as the duty is absolute, I do not think that the transfer agent has the right to inquire into the motives and purposes of the stockholders. In construing the statute of this State relating to domestic corporations the Court of Appeals (*Cotheal v. Brouwer,* 5 N. Y. 566) said: 'The officer having the custody of the books is not constituted by the act a judge of the motives of the stockholder in making his inspection, or of the precise manner in which it shall be conducted, nor of the

purpose which the information thus obtained shall be made to subserve.' The court in that case cited approvingly the case of *People v. Throop,* 12 Wend. (N. Y.) 183, in which the cashier of a bank had refused to permit a director to inspect the discount book, and a resolution had been passed by the board approving of his conduct. The court, however, held that the cashier could be compelled to submit the book for the inspection of the director, although the latter was believed, by the other members of the board, to be hostile to the interests of the institution.

In *Guardian Co. v. White Cliffs Co.* (C. C.) 109 Fed. 530, it is said: "It is insisted that the purpose to foreclose this mortgage is to close out the minority stockholders, and get rid of what may be, for convenience, called the 'Kelly interests.' " A similar question was raised in the case last above cited, but Circuit Judge Lurton, in deciding that case, after citing *Morris v. Tuthill,* 72 N. Y. 575, and *Davis v. Flagg,* 35 N. J. Eq. 493, said: "Whether complainants are conducting this suit from good or bad motives, for their own benefit, or for the benefit of another, is immaterial. It is no defense to a legal demand, instituted in the mode and according to the practice of this court, that the complainant is actuated by personal or improper motives." *McMullen v. Ritchie* (C. C.) 64 Fed. 253; *Forrest v. Railway Co.,* 4 De Gex, F. & J. 131; *Dering v. Earl of Winchelsea,* 1 Cox. Ch. 319. The motive of a suitor can not be inquired into. *Ex parte Wilbran,* 5 Madd. 2; *Thornton v. Thornton,* 63 N. C. 212. Were it otherwise, nearly every suit would degenerate into a wrangle over motives and feelings. *Macey v. Childress,* 2 Tenn. Ch. 442. The general character of these averments seems to come within the ruling of Judge Hammond in *Lafayette Co. v. Neely* (C. C.) 21 Fed. 744, where he decided that "epithetic" fraud is not sufficient to ground an action upon. Like defenses were set up in *Farmers' Loan & Trust Co. v. Green Bay & M. R. Co.*

(C. C.) 6 Fed. 110, 111, and in *Leavenworth Co. v. Chicago, R. I. & P. R. Co.* (C. C.) 25 Fed. 229. In the first case cited the court used the following language, which is applicable to much of the complaint made by Taylor: "There are allegations to the effect that the object of Blair and Dodge and their associates was to obtain ultimate control of the mortgaged property, but the proceedings to foreclose the mortgage were necessarily public and open to all bidders. Confirmation of the sale by the court must, of necessity, also be open to the resistance of any party in interest, if the sale should not be fairly conducted, or if there should be such inadequacy of price as might involve a sacrifice of the property, or injury to the parties interested." The same proposition is ruled in *Toler v. R. R.* (C. C.) 67 Fed. 168.

In *McIver v. Townsend,* 2 S. C. (N. S.) 34, this identical question was before the court of South Carolina, and from the opinion in that case, I quote the following excerpts:

It is very true that whatever rules they may have adopted for the transfer of their stock must be observed, but when a compliance with them is offered, the officers are not at liberty to inquire into the motives of the seller and the vendee, the purpose which prompts the sale, or what will be the effect either on their own road or some friendly one. Nor, if the formalities which they have prescribed as the law which is to govern on such transfer are complied with, can they withhold the proper action demanded of them, no matter what may be the equitable interests of others, who, with notice of the sale, have yet not taken any legal measures to prevent it. . . . The return of the respondents illustrates the fact that, besides the market worth of railroad stocks, they may have a value which might recommend them by reason of the power and patronage which they might command. Their chief objection to the transfer of the shares appears to be the purpose, to which they are to be devoted in the hands of the purchaser, 'to control the said Cheraw & Darlington

Railroad and Cheraw & Salisbury Railroad, for the purposes of their own rival line by way of Wilmington, for their own interests, and for the benefit of interests foreign to the interests and policy of the State, as expressed by the statute book of South Carolina.' With what was so often alluded to in the argument 'as the politics of the case' the court has no concern. It decides on the rights of parties involved in the issue before it, without regard to the extrinsic circumstances which may be the consequence of its adjudication.

But the most decisive case upon this proposition, to my mind, is *Rice v. Rockefeller,* a New York decision reported in 134 N. Y. 174 (31 N. E. 907), wherein, as I think, the exact question is decided. I quote somewhat liberally therefrom, because I think it answers the questions made in the majority opinion. Speaking of the purchase of stock by the plaintiff, it is said:

And the purchase of the stock was open to the plaintiff, and fairly made by him. Attached to it was the quality of transferability, and with it was presumptively the right of the beneficial holder to have recognition as such by means of transfer to him on the books of the trust. And this was essential to the protection of his rights derivable from the title. The remedy sought by the plaintiff is within the equitable powers of the court, and is founded upon an indubitable title, as between him and his vendor, and a right in property. In such case it is difficult to see that motive legitimately becomes a subject of consideration, unless the relief in view may for that reason result unjustly to others in whose behalf it is resisted, or to the prejudice of their legal rights. *Bloxam v. Railway Co.,* 3 Ch. App. 337; *Ramsey v. Gould,* 57 Barb. (N. Y.) 398, and cases there cited. And how that could be the consequence is not evident. The transfer on the books to the plaintiff does not change the identity of the shares, but merely substitutes for one another beneficiary; and the latter is subject to the trust agreement and bylaws. It is true that equitable consideration not recognized in courts of law may control results in courts of

equity. And while the granting of relief there is, in some sense, matter of discretion, it is not an arbitrary or capricious, but a sound, judicial discretion, controlled by established principles in equity, and exercised in view of the crcumstances in each case. 3 Pomeroy Equity Jurisprudence, paragraph 1404. The party seeking relief must come into court with clean hands, as such maxim is understood in its application to that relation. If, for instance, he appears there under false colors, his complaint for that reason may be dismissed. . . . In the present case the plaintiff's claim to relief is founded upon his own title to the shares in question, and the action was instituted and prosecuted solely for his own benefit. The relief, by way of transfer of his stock upon the books of the trust, is not of itself unconscionable, nor is it seen how it can be prejudicial to any legal rights of the defendant, or any other beneficiary. It is not so much to the perfected title in the plaintiff of the shares that the defendants object as it is to the relation which he will, as the consequence of the transfer on the books, take to the trust, nor so much to relief in his behalf as in the alleged apprehension of consequences which may follow its execution; and those are dependent upon the manner he may conduct himself in that relation, whether offensively or otherwise. Whether the plaintiff would seek to do anything other than that which legitimately pertained to the rights of a stockholder is entirely speculative, and it is not seen that anything more than that could be accomplished by him in such relation. The objection before mentioned might be made against any holder of stock, and the reason for its support would be one of degree. It has no relation to the plaintiff's legal right founded upon his title; but the court is called upon to make inquiry beyond that, and into his motives or purposes by which his conduct and actions towards the trust may be influenced if he becomes its recognized beneficiary. As said by a learned text-writer: 'When a court of equity is appealed to for relief, it will not go outside of the subject-matter of the controversy, and make its interference to depend upon the character and conduct of the moving party in no way affecting the equitable right which he asserts against the defendant, or the relief which he demands.' 1 Pomeroy Equity Jurispru-

dence, 399.  Assuming that there may be reasons for denial of relief in an action within the equitable jurisdiction there sought, and founded upon unquestionable title fairly obtained, they must be such as to make it appear that the relief may result oppressively, or to the undue prejudice of the defendant.  In the case at bar the plaintiff's title to the stock derived from his purchase is not challenged by the evidence, but the ground of the defense is in the standing of the plaintiff in his relation to the trust of which the defendants are trustees.  And this is based upon the fact that his was an attitude of hostility to the Standard Oil Company, and, after its creation, to the Standard Oil Trust, arising out of rivalry in business.  This may be a reason for making his recognition as a beneficiary undesirable.  But while there may be an inherent power or discretion in the trustee of a corporation or company, when its due protection requires or justifies it, to decline to perfect title to stock by transfer on the books, it can not be supposed, unless the power is duly reserved to or conferred upon them, that they are for that purpose permitted to discriminate between *bona fide* purchasers, who are owners and holders of its stock by assignment duly and in due form made, to support application for such transfer.  And in view of the facts found by the trial court, and the preponderance of evidence, as we view it, there seems to be no sufficient reason, founded upon the plaintiff's relations to the defendants or to the trust, or otherwise, to fairly justify a denial to him of the rights of any holder in good faith of the stock of the trust.

See, also, as supporting the same views, *In re Klaus,* 67 Wis. 401 (29 N. W. 582); *Helm v. Swiggett,* 12 Ind. 194; *State v. Smith,* 48 Vt. 266; *Senn v. Mercantile Co.,* 115 Mo. App. 685 (92 S. W. 507).

The majority say that *In re Klaus,* is not in point. I merely quote from the syllabus of that case in answer to this assertion:  "The duties of a secretary of a corporation in regard to making transfers of corporate stock are purely ministerial, and he has no right to inquire into the motives of the parties to a transfer."  *Helm v. Swiggett,*

12 Ind. 194, is also said to be beside the question. In that case one of the defenses was that the assignment of the certificate by Ross, the first assignor, to one Banes, the first assignee, was for an illegal consideration. The court said, the suit being against the corporation: "It was no concern of the bank whether Ross transferred the certificate for any, and, if so, for what, consideration. If the bank had no claim upon the stock of Ross for debts due from him, it was not for it to assume a guardianship over his disposal of it. If Ross desired to prevent the transfer of the stock, he should have taken the proper legal steps to restrain such transfer."

In *State v. Smith*, 48 Vt. 266, it is said: "If a sale of stock by a corporation is otherwise valid, it is not vitiated by the fact that the motive of some of the directors and of the purchaser was to enable the latter to vote upon the stock in a certain manner at an approaching election of directors. We have no opinion of the merits of the controversy, or of the wisdom or propriety of the acts of the parties, as disclosed by the testimony. There are some matters disclosed which in the forum of conscience would be obnoxious to criticism that are not unlawful, and are not properly brought in question in this proceeding." Other things are said in this opinion which to my mind are quite closely in point. The *Senn* case, *supra*, is to my mind very closely in point, and it is to be noted that the plaintiff who brought his action to compel a transfer was successful, and it is there said, citing and distinguishing many of the cases: "An examination of the cases dealing with this subject will show that, for the assignee to be denied recognition of his full rights as a shareholder, it must be shown that he is acting in behalf of another. If he is acting in his own behalf he is accorded recognition, though his motive be unworthy." This case cites *Bloxam v. R. R. Co.*, L. R. 3 Ch. 337. Further it is said: "We have found no instance wherein the court refused to

compel a transfer when the petitioner actually owned the stock, on the ground that his object was bad, except when the object was to institute litigation for the benefit of third parties, and no instance where it was done for that reason, unless in *Kingman v. Ry.,* 30 Hun (N. Y.) 73." I refer to this case particularly because of the fact that it reviews all the cases cited in the majority opinion, and clearly indicates that they are not in point upon the question now before us.

The majority seem to find a good deal of what may be called "epithetic fraud," and, as I understand the opinion, deny relief because plaintiff is a party to a conspiracy. In other words, it is contended that plaintiff does not come into court with clean hands, and emphasis is laid upon the fact that he purposes doing something in the future, in the way of litigation or by procuring some sort of information, which will in some manner prevent defendant corporation from purchasing supplies. I am unable to see how a transfer of his shares upon the books of the company is going to aid him in any way if he does attempt to carry out his motives and purposes. As said in *Rice v. Rockefeller, supra:* "The transfer on the books to the plaintiff does not change the identity of the shares, but merely substitutes for one another beneficiary, and the latter is subject to law and to the articles of incorporation and by-laws." I can not see how it can be prejudicial to any of the legal rights of the defendant to have the transfer made to the plaintiff. Whether plaintiff will in the future seek to do anything other than which legitimately pertains to his rights as a stockholder is entirely speculative, and he could accomplish nothing more in this respect with a transfer of his share than he could if the defendant did not make the transfer. At any rate, his purposes have no relation to his legal right founded upon his title to the shares. What the alleged conspiracy has to do with this case, I am unable to divine. It is a general rule that a

court of equity will not go outside of the subject-matter of the controversy and make its interference depend upon the character and conduct of the moving party in no way affecting the equitable right which he asserts against the defendant or the relief which he demands. The doctrine that one must come into equity with clean hands must of course have reference to, and be connected with, the matter in litigation, and must arise out of the very transaction itself. It does not extend to any misconduct, however gross, which is unconnected with the matter in litigation. This is so fundamental that no citation of authorities seems to be needed.

Let us look for a moment to this so-called charge of conspiracy, which evidently is brought into the case to show that plaintiff has his hands besmeared with something connected with the litigation, so that a court of equity should discharge him. It seems to be pretty generally understood that to constitute conspiracy there must be a combination between two or more persons to do an illegal act, or to effect a legal purpose by illegal means. It cannot exist in mere intent, nor is it criminal if the parties combine to resort to legal remedies, and it is not every act which the conspirators may do, even in furtherance of their socalled combination, which is illegal. I think the conspiracy charge in this case, if there be one, is entirely immaterial to the proposition we are now considering. Plaintiff had the undoubted right to purchase his stock, and the man from whom he bought had a perfect right to sell. Surely plaintiff, after getting the stock from his assignor, could not have pleaded, in defense to an action for the purchase price, that he was engaged in a conspiracy to in some way ruin the defendant corporation. Of course, an injunction will lie to prevent injury to property or business, but I doubt if such an action may be maintained to enjoin the conspirators from doing that which they have a perfect right to do; that is, to make lawful contracts

for the purchase of property, notwithstanding it may transpire that it is their motive or intent to use it unlawfully in the future.

The opinion seems to be bottomed upon the proposition that defendants might have enjoined the plaintiff, and restrained him from purchasing stock of stockholders who had the undoubted and unquestioned right of sale. I do not believe that this is true. It is rather curious to note that the majority, in referring to the *Rice* case, *supra,* distinguish that decision from the present one because of the fact that no conspiracy was pleaded. In other words, Rice, no matter how unclean may have been his hands, was entitled to have a transfer made because no one was in combination with him to ruin the defendant's business, whereas the majority say, if it had appeared that some one was in combination with him to secure these results, he would have been defeated. This distinction I am not able to grasp. It will be noticed that in the *Rice* case it was conceded that plaintiff's purposes were the same as were charged in this case against plaintiff, and that relief was granted Rice notwithstanding this charge. His hands were certainly as unclean as if he had been in combination with some one else to accomplish the same results. I have said enough to indicate that in my opinion no good reason is shown why plaintiff should not have the transfer entered upon the books of the company. After such transfer is made, he can do no more than before without the approval of some court; and, if he seeks some remedy to which he is not entitled, or, in other words, puts his purposes into action, the court will see that he does not obtain anything to which he is not entitled. It does not appear, then, that the relief, if granted, would result oppressively or to the prejudice of the defendant.

The majority concede that plaintiff did not mistake his remedy; but they say this is an equitable action. This, I am rather inclined to doubt, for the reason that section

4344 of the Code, reading as follows: "An order of *mandamus* shall not be issued in any case where there is a plain, speedy and adequate remedy in the ordinary course of law, save as herein provided"—has not been repealed. All that I think the amendment to section 4341 means is that the case is to be tried without a jury. Assuming, however, that the case is an equitable one, and conceding that plaintiff is not entitled to have the transfer made, I believe that he is entitled to judgment against the defendants for the value of this stock purchased by him from Fogle. Surely this stock belongs to some one, and Fogle's creditors should not be allowed to take it, nor should Fogle be allowed to vote it. Fogle can not be compelled, however, to return the consideration paid, for the reason that he has done nothing wrong. The defendants in the answer offered to return the sum of $100 to the plaintiff for his use and benefit; and, if the decree is to be reversed, I think it should be upon condition that defendants return to plaintiff the amount which it tendered.

For these reasons, I respectfully dissent from the conclusions reached in the majority opinion.

McClain, J., concurs in the dissent.