WILLIAM HOLSINGER, Appellee, v. E. E. HERRING et al.,
Appellants.
No. 39438.

APRIL 2, 1929.

Ben J. Gibson, for appellants.

O. M. Brockett and Harold S. Thomas, for appellee.

KINDIG, J.—As suggested above, this is a contest between stockholders over the management of the American Laundry Company, a corporation organized for pecuniary profit under the Iowa law. It appears the institution was formed sometime in the year 1902. On January 30, 1923, said concern was capitalized for $12,000, and had outstanding 90 shares of stock. Of that issue, the defendant-appellant E. E. Herring owned 85

shares, and John L. Gillespie, an attorney, of Des Moines, held 5 shares. The plaintiff-appellee came into the organization on the last-named date by purchasing from the appellant E. E. Herring 42½ shares of the corporate stock, for the consideration of approximately $25,400. Consequently, after the consummation of that transaction, stock was held as follows: Appellee, 42½ shares; appellant E. E. Herring, 42½ shares; and John L. Gillespie, 5 shares. Both appellee and appellant E. E. Herring continued in the active management and operation of the business, while John L. Gillespie transacted the legal work for the company. Thus matters remained until May, 1927, when the appellant May Herring, the wife of the appellant E. E. Herring, bought the five shares held by Gillespie. Through that manipulation, the Herrings had control of the corporation.

Appellee claims such advantage was in direct violation of his purchase contract with E. E. Herring and a supplemental agreement between the said Gillespie and the appellant American Laundry Company for the use and benefit of appellee and Herring. These written undertakings were both dated January 30, 1923. So far as material, the agreement between appellee and Herring was:

"It is further understood and agreed, by and between the parties to this agreement [appellee and E. E. Herring], that they contemplate that hereafter each party hereto shall have the privilege of owning or purchasing stock equal to the other party's stock holdings and said parties agree that hereafter if any stock is owned by said corporation and the same is offered for sale, or sold, that each party hereto shall have the privilege of buying an undivided one half (½) of said stock offered for sale, or sold or issued by said American Laundry Company, on exactly the same terms and conditions as the other one half (½) of said stock is offered for sale, sold or issued, and said parties further agree with each other that if any third party offers for sale, or sells, any stock in said American Laundry Company [the only third party who held stock was Gillespie], that each party hereto shall have the option and privilege of becoming the purchaser of any undivided one half (½) of said stock, each party hereto agreeing to see that the other party obtains exactly the same option, privilege and right to purchase or become the owner of said stock, all to the end that each party hereto hereafter

shall have the same privilege, option and right of increasing his stock holdings as to make the same equal to the other party hereto, it being the spirit and understanding of the parties to this contract that hereafter neither party shall do anything which will result in his acquiring a greater stock holding than the other party hereto, without giving the said other party hereto the option, privilege and right of acquiring an undivided one half (½) of said stock upon the same basis as same might or shall be acquired by the other party hereto.''

In conjunction with the foregoing contract, it will aid the understanding to here present the essential parts of the written compact between appellant American Laundry Company and John L. Gillespie, above referred to:

''For a valuable consideration, the receipt of which the parties hereto admit and acknowledge, first party [John L. Gillespie] agrees with second party [American Laundry Company] that the five (5) shares of stock which first party now owns in the American Laundry Company shall hereafter be kept and handled by first party so as to give second party the first privilege and option of purchasing the same upon the same terms and conditions as first party may receive an offer for the same, said second party to accept or reject said offer within ten (10) days from the receipt of the same, and upon the rejection of said offer, then and in that event, first party to be at liberty to sell said stock to third parties.''

Violation of the foregoing agreements was made by the Herrings, appellee contends: First, because the latter was not permitted to buy one half of the Gillespie stock; and second, because the Herrings did not allow the American Laundry Company to purchase all or any part of it. Basis for recovery is placed upon two theories: First, conspiracy between Mr. and Mrs. Herring; and second, the violation of the above and foregoing contracts by them.

For a defense to appellee's charges, the appellants urge that Mrs. Herring obtained Gillespie's stock without any connivance on the part of Mr. Herring. Continuing their argument in this regard, appellants say that a married woman has a right to buy corporate stock with her own property, and when it is thus obtained, she is permitted to manage and control it as if she were

unmarried. Accordingly, appellants introduced evidence to show Mrs. Herring had some property of her own, although not enough to cover the entire purchase price.

With those conflicting views before us, it is now necessary to consider the facts and the legal principles relating thereto.

I. E. E. Herring, appellant, and appellee appeared to have worked in harmony until a dispute arose about the laundry foreman. He was not satisfactory to appellee, but apparently was a favorite of E. E. Herring's. An agreement in reference to the disposition of this man could not be reached, and the matter of dispute was presented to Mr. Gillespie; whereupon the latter decided in favor of appellee, and voted his stock against said appellant's contention. About that time, Mrs. Herring appeared upon the scene. She, too, favored the foreman, and strove to find a scheme whereby her husband could be assisted. Manifestly, both husband and wife thought of the Gillespie stock. Hence, Mrs. Herring said she first approached Mr. Gillespie in reference to the purchase sometime in August or September, 1926,—eight or nine months before the transaction was finally consummated. Her testimony at this point is:

"I asked him over the telephone if his stock was for sale,— that I would like to buy it. * * * Well, I told him that Mr. Herring was not very well, and that we were having some little trouble at the laundry about a foreman, and asked him if he could straighten that out, and he said he did not see how he could. Then I said: 'Have you any stock to sell? Sell me the stock, so I can have a chance to come in and help out a little.'"

During her cross-examination, Mrs. Herring continued:

" * * * Why, I thought then if I could get hold of his [Gillespie's] shares, if I could buy those shares, I might have a chance to vote in cases of that kind, when little trouble come up like that, and that is the only reason that I had thought of buying it. * * * I thought it might help to solve the situation if I could acquire Mr. Gillespie's stock and have a vote, because that five shares was the controlling interest. I knew that, and that would give me a chance to vote. I knew just how much stock had been issued, and how many shares my husband had, and how many shares Mr. Holsinger [appellee] had, and how many Mr. Gillespie held. In talking it over with my husband, Mr. Gil-

lespie did not take sides with Mr. Herring; and in discussing the trouble down at the laundry between the two men, my husband and I naturally talked together about what way that thing could be solved. * * * I was not interested in getting dividends [on the stock] for myself. I never thought about it as an investment for myself, individually and personally, and that, as far as I was concerned, it would not be worth anything like that amount to me [the sum paid]. That was not what actuated me in buying it. * * * The reason I bought it was that they could settle [the disputes in the business] the way he [Mr. Herring] wanted them to be. *That was the real value to me and my husband as a family, to own that stock so that, whenever there was a serious disagreement, his judgment would have to be accepted.*" (The italics are ours.)

Mrs. Herring did testify, also, to this additional fact:

"At the time, I told Mr. Gillespie that I did not want my husband to know about it,—at least for the present."

Why Mr. Herring should thus be kept in ignorance does not clearly appear. Apparently he was not; for, although admonished not to do so, Mr. Gillespie did finally ask Mr. Herring if Mrs. Herring was going to buy the stock. Mr. Herring suggested that he had never heard of the proposition before, although Mr. Gillespie introduced the subject as if he supposed Mr. Herring was familiar therewith. After Mrs. Herring first spoke to Mr. Gillespie about the stock, the Herrings spent some months away from Des Moines, in order for Mr. Herring to rest. Throughout the vacation period, Mr. Herring was worrying about his trouble with appellee, according to the testimony of Mrs. Herring. As indicated by Mrs. Herring's statements, however, during all the time she did not mention to her husband the plan of buying Gillespie's stock. That fact is significant, because the purpose of the trip was to alleviate Mr. Herring's worries. Therefore, why should not his wife, in that event, tell him about her conversation with Gillespie concerning the stock? More than anything else, that, no doubt would have consoled Mr. Herring and stopped his worries.

Obviously, this silence on Mrs. Herring's part is unusual, in view of the fact that this husband and wife originally worked in the laundry together, built up the business, through their own

co-operation, and at all times consulted freely concerning business affairs. Nevertheless, when Mr. and Mrs. Herring returned to Des Moines in the spring, Gillespie did talk to the husband concerning the wife's contemplated purchase. Then, according to appellant's testimony, Mr. Herring went to his home, and brought Mrs. Herring to Gillespie's office, where the transaction was closed. Also, Mrs. Herring stated that, on the way down, nothing was said between them about the stock purchase, although she knew that her funds were insufficient, and it would be necessary to call upon Mr. Herring for assistance. After arriving at the Gillespie office, Mrs. Herring asked regarding the purchase price, and was told that it was $6,500, plus a retainer by the corporation for a period exceeding five years, at a fee of $600 per year. Without asking for an invoice, or making any inquiry whatsoever concerning the reasonable value of this stock, Mrs. Herring, in the presence of her husband, at once accepted Gillespie's offer. Payment to Gillespie was made by a check drawn by Mr. Herring upon his own bank account.

Another most significant circumstance is the fact that Mrs. Herring, in her contract with Mr. Gillespie, as just said, agreed, as part of the stock transfer, that he should be retained as the attorney for the corporation during a period of more than five years. Notation is to be made that Mrs. Herring at this time was not a stockholder, nor did she in any way control the corporation. How, then, could she carry out that part of the contract with Mr. Gillespie? At once it can be seen that the attorneyship agreement between Mrs. Herring and Mr. Gillespie compelled the appellee, as a stockholder, to bear a very material part of the attorney-fee consideration. Such agreement, under the facts and conditions, signifies that Mr. Herring himself was a party to the purchase of Mr. Gillespie's stock; because, except for the joint agreement of Mr. and Mrs. Herring, she could not hope to bind or compel the company to carry out the Gillespie attorney-fee arrangement. In no other way could the corporation be controlled in that regard; and, in fact, Mr. Herring was actually a party to and signed, said retainer contract. This in itself suggests concert of action on the part of Mr. and Mrs. Herring.

But, returning to the fact that Mr. Herring paid for the Gillespie stock, it appears Mrs. Herring accounts to her husband

for this indebtedness as follows: First, by the satisfaction of a $1,000 loan made by Mrs. to Mr. Herring; second, by the satisfaction of another $1,000 loan made by her to him; third, by indorsing and delivering to him a $2,000 note, executed by the American Laundry Company, held by her; fourth, by indorsing to him the note of the American Laundry Company for $1,500, held by both of them jointly; fifth, by executing a note to him for $1,750. Undoubtedly, Mrs. Herring expected no income, and knew that the consideration was too great. An investment for herself was not contemplated. Uncertainty appears concerning her alleged property interests and the pretended consideration conveyed to Mr. Herring in satisfaction of the price paid Gillespie. Whatever may be the truth in that regard, it is plain that Mrs. Herring had personal knowledge of the contracts and agreements aforesaid between her husband and appellee. Forsooth, an ostensible compliance therewith was attempted.

Before Mr. Gillespie closed the negotiations with Mrs. Herring, he notified the American Laundry Company of the proposed sale for $6,500 (although he had already received the purchase price from the Herrings), in order that such institution might, if it chose, purchase, under its prior right so to do. Whereupon, appellee asked that the corporation buy the stock, in accordance with the Gillespie agreement aforesaid; but Mr. Herring refused. Moreover, appellee requested that he be permitted to buy one half of the Gillespie stock, and again Mr. Herring denied the privilege. A deferred stockholders' meeting was held, where Mrs. Herring voted with Mr. Herring and against appellee. It was moved by appellee that he be permitted to buy sufficient stock to make his voting power equal to that of the Herrings. This was denied. The vote was: Wm. Holsinger (appellee), 42½ shares, yes; E. E. Herring, 42½ shares, no; Mrs. E. E. Herring, 5 shares, no. Regarding this, Mrs. Herring says:

"Mr. Holsinger [appellee] made a motion that we would sell, or that we would allow him to buy the shares, is the only thing that I remember. He brought it up, and I voted it down."

Clearly, the alleged compliance with the original Gillespie-American Laundry Company contract (whereby Gillespie should first offer the stock to the corporation), in fact, was no more than a studied pretense on the part of Mr. Herring. If Mr. Herring

had been in good faith, the American Laundry Company could have made the purchase. Financial assistance, if any was needed, could have been supplied by Mr. Herring and appellee. Furthermore, mere arbitrariness prevented appellants from permitting appellee to purchase two and one-half shares of the Gillespie stock.

Material at this instance is a clause from the contract of January 30, 1923, between E. E. Herring and appellee. Said provision is:

" * * * That if any third party [there was no third party in existence then except Gillespie] offers for sale, or sells, any stock in said American Laundry Company, that each party hereto [E. E. Herring and appellee] shall have the option and privilege of becoming the purchaser of any undivided one half (½) of said stock, each party hereto agreeing to see that the other party obtains exactly the same option, privilege and right to purchase or become the owner of said stock, all to the end that each party hereto hereafter shall have the same privilege, option and right of increasing his stock holdings as to make the same equal to the other party hereto, *it being the spirit and understanding of the parties to this contract that hereafter neither party shall do anything which will result in his acquiring a greater stock holding than the other party hereto, without giving the said other party hereto the option, privilege and right of acquiring an undivided one half (½) of said stock upon the same basis as same might or shall be acquired by the other party hereto.*" (The italics are ours.)

Beyond a peradventure of a doubt, Mrs. Herring knew of that provision in the contract. Certainly Mr. Herring did. Both husband and wife attempted to circumvent and avoid the legal effect of those contractual provisions, for the avowed purpose on the part of both to obtain corporate control of the laundry company and settle managerial questions according to their own desires. Conspiracy "is a combination of two or more persons by some concerted action to accomplish some unlawful purpose or to accomplish by unlawful means some purpose not in itself unlawful." *Mowry v. Reinking,* 203 Iowa 628.

No doubt, Mrs. Herring had a right to buy Gillespie's corporate stock. That conduct on her part, in and of itself, was not

unlawful. *Funck v. Farmers Elevator Co.*, 142 Iowa 621. Yet it became illegal when the very purchase itself, as intended, was a direct violation of the contracts with appellee above described. Proof of conspiracy may be established by circumstantial, as well as by direct, evidence. *Boom v. Boom*, 206 Iowa 70; *Mowry v. Reinking*, supra; *Hanson v. Kline*, 136 Iowa 101.

Hence it is plain that, through conspiracy and concert of action, Mr. and Mrs. Herring schemed and planned to, and did, obtain from Mr. Gillespie the five shares of stock, in direct contravention of appellee's contract concerning the corporate control. At the inception of the business undertaking, appellee paid a large and valuable consideration, and the inducing cause thereof was equality of corporate control between him and Mr. Herring. Equity will interfere to relieve appellee from the wrongful advantage designedly obtained by Mr. and Mrs. Herring. They cannot excuse their misconduct through the shallow pretense that a married woman has a right to buy and sell corporate stock, or the other equally insufficient contention that the five shares now belong to the wife, and therefore she can vote the same at her pleasure. While speaking generally, yet not specifically, upon this subject, this court suggested, in *Funck v. Farmers Elevator Co.*, supra:

"It is undoubtedly true that the mere motive of the purchaser of corporation stock will not ordinarily be inquired into, nor be deemed material by the court in a proceeding to order the transfer of stock on the books of the company. * * * To our minds, this case presents something more than the mere motive of the plaintiff. The evidence discloses an active conspiracy, which it would be the duty of the court to enjoin if proper jurisdiction could be acquired. * * * If this transaction stood alone, the plaintiff would have the absolute right to the relief demanded, as held by the trial court. But must the court aid a conspiracy to its final goal simply because it travels this part of the way over a legal highway? We think not. In the light of the evidence, the plaintiff does not stand before the court as a mere purchaser of stock in the defendant company, but as a conspirator, * * * working in conjunction with many others by unlawful means toward an unlawful end. A conspiracy usually, often necessarily, involves in its details many lawful acts: that is to say, acts which in themselves would be

lawful. They are none the less unlawful as parts of the plan of conspiracy. * * * "

Likewise, in the case at bar, Mrs. Herring had a right to buy corporate stock. Such purchase, in and of itself, would not be unlawful. On the other hand, her stock purchase, although, when standing alone, lawful, became illegal when performed as part of an unlawful plan, with a common design and conspiracy with Mr. Herring to wrongfully violate appellee's contract and take from him the right of equal corporate control, contrary to law. More than this, it is evident that, under all the facts and circumstances, the purported stock purchase made by Mrs. Herring was, in fact, that of Mr. Herring.

Wherefore, some equitable relief was properly allowed appellee.

II. Appellants, however, complain because the district court was too drastic in the measures taken to afford appellee a remedy. Three general steps were taken by the district court for the protection of appellee, to this effect: First, appellants E. E. Herring and May Herring, together with their heirs, legatees, transferees, assigns, and legal representatives, were permanently enjoined "from voting or attempting to vote at any meeting of the stockholders of the American Laundry Company more than 42½ shares of said stock" embraced within the "block" covering Gillespie's additional five shares; second, the appellant E. E. Herring was ordered and directed "forthwith to produce a certificate of his stock holdings, showing ownership in him of five shares or more, and present the same to the district court clerk," who, under the court's direction, should then make proper indorsement in reference to the non-voting of five shares thereof; and third, appellants E. E. Herring and May Herring, or either of them, were permitted at any time to sell and properly transfer unto appellee, his assigns, or transferees, 2½ shares of stock for the sum of $3,250, without interest, and thus avoid said injunction.

Under the issues here presented, it is manifest that the court was fair and just with appellants. Nothing less could have been done, and at the same time protect appellee. Necessarily, then, appellants have no just complaint.

III. Turning now to appellee's appeal, it is found that his objection is directed to that portion of the judgment and decree

above outlined fixing the purchase price for the 2½ shares of stock at $3,250. To elaborate, appellee argues the fair and reasonable market value of this stock is less than such sum. Resultantly, he concludes that his half of the Gillespie stock should be obtainable at the fair, as distinguished .from the actual, value Mrs. Herring paid the previous owner therefor.

A solution of this problem can be found in the original contracts, respectively, between Herring and appellee and Gillespie and the American Laundry Company. Among the provisions of the agreement between Herring and appellee is this one:

"That if any third party offers for sale, or sells, any stock in said American Laundry Company, that each party [appellee and E. E. Herring] hereto shall have the option and privilege of becoming the purchaser of any undivided one half (½) of said stock. * * * It being the spirit and understanding of the parties to this contract that hereafter neither party shall do anything which will result in his acquiring a greater stock holding than the other party hereto, without giving the said other party hereto the option, privilege and right of acquiring an undivided one half (½) of said stock *upon the same basis as same might or shall be acquired by the other party hereto.*" (The italics are ours.)

Similarly, it is stipulated in the agreement between Gillespie and the American Laundry Company that "first party [Gillespie] shall give the second party [the American Laundry Company] the first privilege and option of purchasing the. [5 shares of stock] upon the same terms and conditions as the first party may receive an offer for the same. * * * "

Those provisions settle the dispute. All parts of each contract are enforcible. This includes the favorable, as well as the unfavorable. Gillespie could obtain $6,500 from the Herrings for the five shares. One half thereof is $3,250. These 2½ shares could be and were purchased by the Herrings for the last-named sum. Consequently, within the terms of the foregoing written understanding, it is incumbent upon appellee also to pay that amount. We are constrained, therefore, to disagree with appellee's idea.

, Wherefore, the judgment and· decree of the district court should be, and hereby is, affirmed on both appeals.—*Affirmed on both appeals.*

ALBERT, C. J., and EVANS, FAVILLE, WAGNER, and GRIMM, JJ., concur.